## W. B. JELKS et al. vs. MARY BARRETT et al.

1. EVIDENCE : *Primary.  Secondary.*
Evidence which is ordinarily secondary may become primary by the loss of that which was originally primary. "Evidence which carries on its face indications that no better remains behind is not secondary, but primary."

2. AUCTION SALES OF REALTY : *Statute of frauds.*
Though originally much questioned, it is now well settled in England and America that the statute of frauds applies to sales of realty at auction. In such sales the auctioneer acts as agent both of the seller and the buyer. In order to make the sale valid the auctioneer or his clerk must write down the name of the bidder and the price bid opposite the parcel of land sold. This memorandum must be made at the time of the bidding or immediately afterwards. It must be made upon some book or paper which sets forth the land sold and the terms of the sale physically annexed to such book or paper, and must distinctly refer to it. When thus evidenced an auction sale meets the requirements of the statute of frauds, and a court of equity will compel the payment of the money and the delivery of the deed.

3. UNDELIVERED DEED : *Will not convey title.*
An undelivered deed, however perfect in all its parts, is not of itself sufficient to convey title, but may, in connection with other circumstances, be valuable in affording evidence to establish the particulars of the transaction.

4. POWER OF SALE IN WILL : *Sale at auction.*
The power to sell land, conferred upon executors by a will, unless in some manner restricted, embraces the power to sell at auction as well as in other modes. Where the auction sale has been made by the executors a court of chancery may, by its commissioner, have the deed executed.

APPEAL from the Chancery Court of *Hinds* County.

Hon. W. B. PEYTON, Chancellor.

All the material facts in this case will be found in the opinion of the court.

*Shelton & Shelton*, for appellants :

The 14th section of Perry Cohea's will provides for a sale of his land in Hinds county ; 17th gives his estate to his children and grandchildren ; 18th appoints J. Stowe, Samuel, Matthews, and D. A. Cohea his executors.

The purpose of the bill is to charge the heirs, upon an *alleged* agreement of Samuel Matthews and D. A. Cohea, executors, with John Echols, made in June, 1859, for sale to Echols of the land in controversy, and to procure title.

*The power to sell has never been executed, and a court of*

*chancery has no power to execute it.* Code, 1857, pp. 309; 2 Washb. on Real Property, pp. 608, 609, 619, 628, 629.

The deed claimed to have been deposited with Potter is relied on as a memorandum to take the case out of the statute of frauds. The proof leaves it in doubt if Matthews ever signed it; but, even if he did, it was not deposited as an escrow, and was no written memorandum of the contract sued on.

Complainants try to make out a memorandum of the contents, signed by the executors, by secondary proof of the contents of a map, a hand-bill advertisement, and a pencil memorandum, all three burned in Potter's office, in February, 1864. *It has not been done.* The proof does not show it.

It is apparent that, under the statute of frauds, there are several fatal deficiencies in the proof. The signature required by that statute is not proved. As to the map, there is no proof that any person signed it. As to the printed advertisement, the proof is positive that Matthews never did sign it. The only proof is that his name was printed on it, as one of the persons advertising the sale. He says a copy of it was sent to him in Panola county, and he signed two or three deeds, but only after full payment in good money. *As to the pencil memorandum*, Boyd, the auctioneer, proves that he did not make that memorandum. Matthews was at his residence in Panola county at the time of the sale and never saw the memorandum.

But if the signing had been proved, the terms of the contract have not been proved, and there is no price proved. The identity of the lot, by proof of the contents of the writing, is also wanting under the statute of frauds. Take the contents of the writing as made out by secondary evidence as the basis of adjudication, and that is the only correct basis under the statute of frauds. The proof is very deficient as to signature and as to price, as to terms of sale and as to the identity of the lot. Apply the rules of law, and we reject all the proof except as to the contents of the writing as recol-

lected by the witnesses. Brown on Frauds, 399; 3 Pars. on Con., 14; 8 S. & M., 681; 42 Miss., 730; 3 Pars. on Con., 13; Brown on Frauds, 374; 27 Miss., 828; 8 S. & M., 861; 23 Miss., 295; Hill on Frauds, 95, 96; 4 Br. Ch. Cases, 138; 8 S. & M., 484.

*Harris & George*, for appellees:

The points we insist on are:

1. The evidence shows that the contract of sale was suffi- ciently evidenced by a memorandum in writing, according to the established rule in auction sale. 5 Strobh. (S. C.), 129; 1 Hilliard on Vendors, 88, 89, citing 2 Taunt., 38; Hilliard. on Sales, 638; 47 Miss., 678; 48 ib., 23.

2. The execution of the deed by the executors, drawn according to the memorandum, is sufficient to take the case out of the statute of frauds. 6 Gratt., 78; 9 ib., 1; 1 Sugden on Vendors, 57; 4 Munf., 77; Hilliard on Vendors, 115–119, § 23.

3. Part of the money having been paid and the contract recognized, the vendor holds the legal title as a mortgagee, and a court of equity will hold the contract open until demand is made for the balance. Bellamy *v.* Shelton, 26 Miss., 250; Johnson *v.* Jackson, 27 ib., 498; Stewart *v.* Yates, 30 ib., 100; Walton *v.* Wilson, ib., 576; Arthur *v.* Pearlson, 32 ib., 131; Profit *v.* Robinson, 34 ib., 141; Jones *v.* Loggins, 37 ib., 546.

4. No specific or definite steps were ever taken by the executors to put an end to the contract, or by their successors. The former continued to recognize it, and the latter have taken no steps to put an end to it.

5. On the principles announced in the cases cited we main- tain that the receipt of a part of the purchase money, and the acts of the vendor in *treating the time of payment as not mate- rial,* by granting indulgence, impose on him positive duties, as well to the purchaser as to the vendee, and if he chooses to put an end to the contract he must take specific steps to do it. To delay these steps and then sue in law would be taking an unconscionable advantage. Authorities already cited.

6. There is no demurrer to the bill and that its material allegations are sustained. The proof shows a contract of sale, valid under the statute of frauds : 1st. A map of the land sold. 2d. A printed advertisement by the executors of the terms of the sale, with their names printed to it. 3d. A memorandum on the back of the advertisement of the names of the purchasers, price per acre bid, and the number of the lot sold to him, corresponding with the numbers on the plat. These were delivered by Cohea, one of the executors. 4th. He prepared deeds, acknowledged and sealed. Among these was one to John H. Echols for lot No. 12 of the Cohea survey. The map and memorandum gave full information how to draw the deeds.

CHALMERS, J., delivered the opinion of the court.

The heirs of Perry Cohea brought ejectment in the circuit court of Hinds county against the heirs of Thomas Barrett, and against the Vicksburg & Meridian Railroad Company, for the recovery of a certain tract or parcel of land in the city of Jackson.

Thereupon the heirs of Barrett and said railroad company filed the bill in this cause enjoining said ejectment suit, setting up an equitable title to the land in themselves, and praying for a divestiture of the legal title out of the Cohea heirs, and its investiture in them. They had decree in the chancery court, from which the heirs of Cohea appealed. The correctness of this decree depends upon whether complainants have sufficiently established their equitable title, and this in turn depends upon testimony, in great measure parol, to a considerable extent conflicting and obscured by long lapse of years and destruction of papers. Without going into it in detail, or giving in full the reasons which have conducted us to our conclusion upon the facts, we will indicate what in our opinion are the facts as established by the weight of the testimony, and then pronounce the law arising thereon.

Perry Cohea died the owner of the land in controversy. By his last will and testament he appointed L. J. Stone, Samuel Matthews, and David A. Cohea his executors. The 14th

clause of his will directed "that his lands in Hinds county shall be sold by his executors, upon such terms and upon such credit as they in their discretion shall deem most advisable for the interest of all concerned in the estate, and directs the executors to lay off the lands into lots of ten, twenty, or thirty acres each, and sell them on the most advantageous terms, securing the payment therefor in a safe and satisfactory manner." By a subsequent clause in the will it is declared that the powers conferred upon the executors may be exercised by any two of them. All of the executors qualified, but Stone died before any attempt was made to carry out the 14th clause of the will. In the summer of 1859 the two remaining executors had the land surveyed, sub-divided into lots, a map or plat thereof prepared, and the several lots thereon designated by numbers, and the whole advertised for sale by written or printed hand-bills. The sale was made by an auctioneer, at public outcry, in front of the state capital. Much question is made as to whether the executor Matthews was present, or took any part in, or authorized, this sale. Our impression is that he was not present, but we are satisfied that it was made with his full knowledge, consent, and authorization.

The other executor Cohea was present, actively superintending the sale. At the sale the parcel of land in controversy, designated on the map, and since known, and subsequently conveyed and described, as lot No. 12, was struck off to John H. Echols, from and under whom complainants claim, for the sum of $789.30. Three days after the sale Echols paid to the executor Cohea the sum of $263.10, being one-third of the amount of his bid, and took his receipt therefor, which receipt is preserved, and was filed with Echols' deposition. It fails to designate the lot purchased or the price to be paid. A few days thereafter the executor Cohea carried to George L. Potter, the attorney of the estate, the map made by the surveyor preparatory to the sale, showing the lots into which the land had been divided, and also delivered to him one of the printed advertisements of the sale, giving the time, place,

and terms of sale, signed, or purporting to be signed, by the executors. On the back of this printed hand-bill was indorsed, as Mr. Potter declares, a pencil memorandum. "It gave the numbers of lots corresponding with numbers of lots laid off and numbered on said map of survey. Opposite to each number was the name of a person, and an amount in figures giving, as I (Potter) think, the price per acre." This memorandum contained the name of Echols opposite a lot which Potter describes, not by its number, but by its location, and which by such location corresponds with lot 12, the one in controversy. Cohea told Potter that this memorandum had been made by the auctioneer. The auctioneer testifies that he made no memorandum, but thinks that Matthews made it. Matthews testifies that he was not at the sale, and of course could not have made it. Impossible as it is, after the long lapse of time, to ascertain who made it, we feel satisfied that it was made by the auctioneer, or by some one acting for him as clerk at the sale. The map and the memorandum were given to Potter to enable him to draw the deeds for the several purchasers, of whom there were quite a number. He says that they were sufficiently full and explicit to enable him to do this without difficulty, and he accordingly did it.

The deeds, however, were not delivered until all the money was paid, and, as the sales had been made partly on time, there was of course no need for hurry.

In addition to this, the state of Mississippi at that time held a large judgment against Perry Cohea's estate, which was in the course of compromise and settlement, and Potter advised the executors not to collect the purchase money until that settlement was effected. This produced delay in the payments of purchase money and delivery of the deeds, in the first instance, and the breaking out of the war shortly after this old judgment was settled doubtless produced still more. At all events the deferred payment was never made in full by Echols. During the war the deeds, which had already been signed and acknowledged by David Cohea, were sent to Panola county and signed

and acknowledged by Matthews, and returned by him to Potter. Matthews thinks that there was no deed to Echols among them. Potter is confident that there was.   We think the latter, as the more conversant with the matter in hand, the more likely to be right.   The deeds were retained by Potter and never delivered to the purchasers, for the reason that the purchase money was not paid.   In February, 1864, Potter's office was burned, and with it perished all the deeds, the printed advertisement with the pencil memorandum thereon, and the map made by the surveyor.   Of the latter, however, Echols had made a copy of so much at least as bore upon the land in controversy, and this copy has been preserved, and is believed by Potter to be essentially correct.   The loss of the papers, the long lapse of time, the confusion of memory incident to a civil war, and the death, before this suit was instituted, of David Cohea, the active participant in all these matters, have necessitated a resort to parol proof, much of which, however, though ordinarily secondary, has become primary by the loss of that which was originally primary.   "Evidence which carries on its face no indication that better remains behind is not secondary, but primary.   1 Greenl. on Ev., § 84.   That there should be some conflict and some presumptions necessary to be indulged, is unavoidable.   The fullness of proof which has been preserved, and the satisfactory nature of it, is under the circumstances unusual and remarkable.   While the conclusions to which we have arrived may not be incontrovertible, they are, we think, supported by the entire testimony, fairly considered.

The description of the lot is, we think, sufficiently made out by the number of the lot, and by the copy of the map preserved by Echols and identified by Potter.

The price to be paid is exactly fixed by the stipulation contained in the printed advertisement, that one-third was to be paid in cash, the amount of which third is shown by the receipt of David Cohea, given to Echols.

As to the time when the balance was to be paid there is

some doubt, but this is immaterial, since it was all admittedly due long before the commencement of this suit.

Echols took possession under his purchase at the aution sale, and he and his vendees, the present complainants, have been in quiet and uninterrupted possession ever since, notoriously claiming as owners in the face of the Cohea heirs, some of whom have lived all the time in the immediate vicinity of the property.

In the meantime the property has greatly enhanced in value, and costly improvements have been erected thereon.

Other purchasers at the auction sale have also held undisturbed possession, under deeds executed in accordance with the terms of the bids made at the auction.

Complainants, in their bill, offered to pay the balance due on the Echols bid, and in the decree of the court below it was ordered accordingly.

Upon these facts the legal question presented is whether there has been such written memorandum of the sale of the land as is required by the statute of frauds. It was much questioned at an early day whether auction sales were within the statute. Whatever doubt may have existed on the subject seems to have been put at rest by Lord Ellenborough's decision in Hinde v. Whitehouse, in 1806, reported in 7 East, 558, and since that time it has not been questioned in England or America. Equally well established are certain principles peculiar to this class of sales. The auctioneer acts as the agent of both the vendor and vendee; of the former from the inception of the bidding, of the latter only from the coming down of the hammer and the acceptance of his bid. Benj. on Sales, 190; Wardlow v. Harrison, 1 Ell. & Ell., 294. From the acceptance of the bid the auctioneer becomes the agent of the bidder, so far as to bind him by putting down his name opposite to the article sold on the auction list; and this may be done either by the auctioneer or by the person acting as his clerk, provided it is done at the time of sale. A delay only of a few hours has been in some cases held fatal.

It is necessary, however, especially in cases of realty, that this

memorandum should be made in some book, catalogue, advertisement, or paper of some sort containing the subject-matter and terms of sale, or so definitely referring to such a paper as to make it a part of it, either by the physical contact or by the reference.   When the memorandum is made by the auctioneer, or his clerk, there is such a signing as complies with the statute of frauds.   Hill. on Vend., § 88; Gill *v.* Becknell, 2 Cush., 355; Cathcart *v.* Kernaghan, 2 Strobh. (S. C.), 129; Hicks *v.* Whitehouse, 12 Wend., 548; Craig *v.* Godfrey, 1 Cal., 415; Ijams *v.* Hoffman, 1 Md., 423; Hill. on Sales, 479, *et seq.*

Tested by these rules, we think a sufficient compliance with the statute has been shown in this case.   It is proved by Echols that the written or printed advertisement which Potter testifies was signed by the executors was present at the sale, and contained the terms upon which the land was to be sold. The surveyor's map of the lands, indicating by numbers its several subdivisions into lots, was present at the sale, and the lots were sold by the numbers according to the map.   The map and the advertisement were then carried by one of the executors to Potter, and indorsed upon the back of the advertisement were the numbers of the several lots, as shown by the map, and opposite each one the name of the purchaser and the price.   The executor told Potter that this was the memorandum of the auctioneer.   We are satisfied, from all the circumstances of the case, that it was his memorandum, or that of some duly authorized clerk.

From the memorandum and map thus furnished Potter was enabled correctly to prepare deeds for the several purchasers, which were signed and acknowledged by the executors, but were never delivered to the vendees.   We think the preparation and signing of the deeds important facts, as showing the accuracy of the written data, and the participation of the executor Matthews in the whole transaction.   They have been pressed upon our consideration as being of themselves a sufficient writing to take the case out of the statute of frauds.   Two

cases so holding have been laid before us from the supreme court of Virginia.   Bowles v. Woodson, 6 Gratt., 78 ; Powell v. McKinley, 9 ib., 1.

We are not inclined to concur in the opinion of the Virginia court, but rather to adhere to the doctrine announced by our predecessors, in Johnson v. Brook, 31 Miss., 17, to the effect that no written instrument, however perfect, is sufficient of itself to convey title to land so long as it remains in the exclusive possession of the vendor.   This point, however, not being essential to the case at bar, is left to stand upon the decision in 31 Miss.

It was earnestly argued by counsel for appellants that even if all the formalities requisite to an auction sale had been complied with, but no deeds made nor money paid or secured in full, no relief could be granted, because, first, the will of Perry Cohea did not authorize his executors to sell the land in this manner ; and, second, that even if it did, the power died with them and could not be exercised by a commission to be appointed by a court of chancery.   The first proposition rests upon the assumption that an auction sale of land is only an incomplete and executory contract until the delivery of a deed.   This is erroneous.   It is complete as a sale, though the legal title does not pass until the deed is delivered, just as in the case of a title bond, or of a receipt given for purchase money, specifying terms and the land sold.   There is no restriction upon the mode of sale contained in the will.   The power is broad and unlimited.   They may make, therefore, any sale which the law recognizes as such.   The second position is also fallacious.   It is true that powers conferred by will upon one person, by name, cannot ordinarily be executed by another ; but that is not what is sought here.   The power conferred by the will in this case was to make sale.   That power was executed, as we have seen, in one of the modes recognized by law, by the executors named.

The executors being now dead, it is only asked that the chancery court, through its commissioner, may deliver the

paper evidence of that sale, which is necessary to convey the legal title. It differs in no respect from the reception of a title bond and the death of the vendor before the execution of a deed. If the executors in this case had sold by title bond there could be no question of the power of the court to make and deliver a deed.

Let the decree be affirmed with costs.