## ALBRIGHT v. KALBITZER.

### Civil Action No. 3513.

District Court, E. D. Pennsylvania.

Oct. 16, 1945.

Crosky & Edwards by Ralph S. Crosky, all of Philadelphia, Pa., for plaintiff.

Karl W. Johnson, of Upper Darby, Pa., for defendant.

KALODNER, District Judge.

This is an action ex contractu in which the plaintiff, in addition to damages for breach of contract, seeks an accounting. The defendant has set up a counterclaim also seeking recovery of damages for breach of the same contracts by plaintiff.

The cause was tried before the Court without a jury. The facts are as follows:

Plaintiff Albright, of Chicago, Illinois, and the defendant Kalbitzer, of Paoli, Pennsylvania, entered into a contract on May 6, 1943, whereby the plaintiff was, inter alia, to sell certain poultry and egg processing and handling equipment, and poultry eviscerating equipment to be manufactured by the defendant; the agreement was to continue effective for one year. On May 7, 1943, the parties executed a sup-

plementary agreement extending the prior contract to include certain patented poultry picking equipment for which plaintiff held a license; this agreement was to continue as long as the plaintiff held the license. Both contracts are set out in full in an appendix.

The plaintiff has charged the defendant with failure to perform practically all the provisions of the agreements, and on this basis seeks the recovery of damages. The prayer for an accounting is founded upon the thesis that the contracts accorded to the plaintiff an exclusive right to sell, which the defendant is alleged to have violated by making sales over the plaintiff's head without payment of commissions to the plaintiff. The defendant admits an exclusive agency, but denies that under the terms of the contract he himself was precluded from making sales.

The defendant also asserts that the plaintiff failed to meet the minimum requirements as to sales set forth in Paragraph 2(f) of the contract of May 6, 1943, and for this reason he wrote to the plaintiff on November 10, 1943, terminating that agreement.

It also appears from the record that the plaintiff's license to manufacture the poultry picking machines, subject to the second agreement, terminated about November 9, 1943, at about which time the defendant acquired a similar license.

■ A preliminary question may be resolved at the outset. The defendant attacks the jurisdiction of this Court, on the ground that the jurisdictional amount, necessary in diversity of citizenship cases, is lacking here. However, this issue was determined against the defendant on his motion to dismiss by my brother Ganey, J., on August 11, 1944. I may add that the pleadings do not disclose the legal impossibility of a judgment for the plaintiff in excess of the jurisdictional amount. See Hiltz v. Atlantic Refining Co., 1944, 57 F. Supp. 308, decided by this Court.

Coming to the merits of the controversy, the plaintiff seeks to recover commissions on sales alleged to have been made by him between May 6, 1943, the date of the first contract, and November 10, 1943, the date of the defendant's letter of termination.

■ It is hardly necessary to discuss in detail all the business done by the parties during this controversial period. Admittedly on the Ebbs & Son order of July 13, 1943, the commission was paid. On the Chicago Foods Products order of April 20, 1943, referred to at the trial as the Horwitz transaction, plaintiff did receive a commission, but he is not entitled to commission under the contract since the sale was made prior to the execution of the contract.

■ Concerning the Dorset Foods order, Albright testified, and I credit his testimony, that he made the contact with Dorset in Long Island, New York, that he measured the building and helped prepare the blueprints for the layout, and that he then called Kalbitzer asking him to go to Dorset because the firm was ready to place its order. Kalbitzer took the order, and the unit was installed sometime in October, 1943. While this transaction may come within the plaintiff's contention that he had an exclusive right to sell, I think he is entitled to the agreed commission on the ground that he was at least the efficient cause of the sale, particularly since there was no break in the negotiations. See Restatement, Agency, Section 448, and the Pennsylvania Annotations thereto.

■ As to purchases by the plaintiff, while they may be counted under Paragraph 2(f) of the agreement of May 6th, plaintiff is not entitled to commissions where he himself was the purchaser at cost.

■ Thus, plaintiff proved an order dated September 25, 1943, which was never shipped. Defendant's counsel, in his brief, states that it was established no such order was received, but admits he could find no such testimony in the record. Neither can I, and I must therefore accept the plaintiff's proof. Also plaintiff proved an order for two machines dated June 22, 1943; this order was to be applied to a prior order for five machines dated May 19, 1943. This order was not shipped. Since these orders were purchases by the plaintiff for his own account, no commissions become due. While he may be entitled to damages for defendant's failure to ship, he has not offered proof thereof.

The remaining orders handled by the plaintiff during the period from May 6, 1943, to November 10, 1943, are characterized by the fact that they were communicated to the defendant, but defendant failed to make deliveries thereon. On these orders, the plaintiff seeks to recover commissions as sales made. In view of the ad-

mission[1] of the defendant that the contract provided for commissions on "sales," the only question in dispute is the meaning of the term "sales," concerning which the contract is silent.

The defense to this claim is that the term "sales" requires a delivery and passing of title; therefore, since no deliveries were made, no commissions became due.

Considering the admission, I think this view is too narrow. Ordinarily, where, as here, the contract is silent, it is sufficient if an enforceable contract of sale is executed. See Restatement, Agency, Section 445 Comment (e); 2 Amer.Juris., Agency, Sections 302, 303. In any event, since the defendant was bound to fill all orders, and failed to do so, plaintiff is entitled to damages in the amount he would have realized if the order had been filled. Johnson v. Hoosier Drill Co., 1881, 99 Pa. 216; see Penn Anthracite Collieries Co. v. Coleman & Co., Inc., 1945, 53 Pa.Dist. & Co.R. 420. Here, such damages constitute plaintiff's commissions, in the absence of mitigating evidence. See 1 Sutherland, Damages, 3rd Ed. (1903) p. 215.

One transaction to which this conclusion is particularly applicable is that referred to during the trial as the Rabinowitz order of May 21, 1943. Although the defendant accepted the order procured by the plaintiff, and the contract with Rabinowitz, calling for equipment valued in excess of $6,000, was legally enforceable, the defendant released the purchaser for $750, considerably less than the plaintiff's commission. On the view I have taken, the plaintiff is entitled to the agreed commission for making this sale. See Lieberman v. Colahan, 1920, 267 Pa. 102, 105, 110 A. 246; Blau v. Kettling, 1928, 94 Pa.Super. 411; cf. Cooper v. Midland Metal Co., 1914, 56 Pa.Super. 485.

Another transaction in this group was the order obtained by the plaintiff from the Charles Keeshin Poultry Co., on or about October 6, 1943. To the claim for compensation on this order, it seems to me there is a valid defense. Admittedly Albright never furnished a priority rating, and clearly, unless he was led to believe otherwise by the defendant, he could not have expected this order to be filled in view of Paragraph 2(g) of the contract of May 6th. That the defendant showed a willingness to fill the order without a priority rating does not help the plaintiff, for any such action would have been illegal and plaintiff could not recover his commission as a matter of public policy: The Court will not further an illegal arrangement. See Pollock v. MacElree, D.C.E.D.Pa.1944, 56 F.Supp. 961. Moreover, the inference that in accepting the order the defendant intended to obtain the priority himself, waiving the plaintiff's obligation under Paragraph 2(g) of the contract, is rebutted by the fact that the order form discloses on its face that the priority was to follow. Plaintiff, accordingly, is not entitled to any compensation on this transaction.

Concerning the order of the R. H. Macy Co., dated August 19, 1943, the defendant testified that at that time he was engaged in government work which carried a higher priority and which prevented his filling the Macy order. If this were so, certainly under the terms of the contract, which required the plaintiff to furnish a high enough priority to enable the defendant to fill orders, defendant could have properly rejected the order. Perhaps even if he accepted the order, this defense would still be valid. The difficulty is that not only did defendant accept the Macy order and begin production, but he never stated to the plaintiff that a higher priority would be necessary. In fact, in his letter to the plaintiff dated August 31, 1943, the defendant stated, "Concerning the Macy pickers; motors have been shipped and as soon as we receive same we will ship the pickers. We understood that the Macy display only lasted during the New York show, that is why we did not ship the machine without motor." With this in mind, I cannot credit the defendant's statement that the government contract interfered with his completion of the Macy order. Moreover, the priority extended for this order was otherwise sufficient. Therefore the plaintiff, having made a sale, is entitled to his commission.

The defendant also refused to pay the plaintiff a commission on an alleged sale to the Berger Kleifgen Co., on about June 23, 1943. This sale involved a

[1] The record, if it does nothing else, discloses that both parties intended, and so construe the written agreements, that the stipulated sums were to constitute commissions on sales.

Whistler Universal picker which was subject to the supplemental agreement of May 7, 1943. Under paragraph 1 of that contract the defendant agreed to manufacture this machine and under paragraph 2 the plaintiff agreed to sell it at a price of $435.00. The plaintiff extended an AA3 MRO priority, which, under CMP Regulation 5 (CCH War Law Service, Priorities 1, Sec. 33,228) was sufficiently high to enable filling of the order.[2] The defendant testified, however, that he had never made a Universal machine, and that plaintiff had agreed to obtain for him plans for its construction or a sample machine, which, admittedly, was never done. Plaintiff, on the other hand, testified that the defendant did not tell him he could not make the machine until after he had obtained the Kleifgen order. Since the defendant agreed to manufacture the Universal machine and to accept orders for it, the burden rests upon him, as a matter of defense, to show that the plaintiff was under a duty to supply him with information for construction. Aside from the contradictory testimony of the parties, the only other pertinent evidence is a letter from the plaintiff to defendant dated June 17, 1943, in which the plaintiff stated that he had an order for a Universal Machine (the order dated June 23rd). While this letter indicates a recognition on the part of the plaintiff that the defendant required a sample before he could manufacture the machine, and shows that he undertook to secure such a sample for the defendant, nevertheless it leaves it to the defendant to secure the sample. The letter does not help in placing a duty on the plaintiff, and therefore, it is my opinion that the defendant failed to prove the duty. He is left, then, with the obligation to accept orders for and manufacture the Universal picker.

Plaintiff also seeks to recover as damages loss of profits, i. e., commissions, on uncompleted sales by reason of the defendant's termination of the contractual arrangement by letter dated November 10, 1942.

Clearly, if the defendant were justified in terminating the agreement, Albright is not entitled to additional damages on orders taken but not communicated to the defendant. The immediate question, therefore, is whether the termination was based upon cause. On this determination, also depends the outcome of the defendant's counterclaim.

The reason assigned for the termination is that Albright failed to meet the minimum purchase and sales requirement contained in Paragraph 2(f) of the contract of May 6, 1943; to wit, he did not "buy or sell for Company, an average of two complete eviscerating units each month, or·a cumulative average total of seven thousand dollars per month of all merchandise based on the selling price to the purchaser thereof, commencing from the date of the completed installation of the first unit shipped by Company."

It is the defendant's contention that between the 6th of May and the 10th of November, 1943, plaintiff did not meet this requirement. Aside from the truth of this contention, I think it obvious that, since the term of the contract was for one year, the "average" referred to is the average over a period beginning with the date of the completed installation of the first unit and ending with the last day of the contract. The average most certainly is not over a period the length of which is determined by the defendant. Since the defendant does not take the position that to have waited until the end of the contract year would have been in vain, whatever aid that argument might have afforded him in view of the evidence that plaintiff did all he could in furtherance of the agreements, I am of the opinion that his termination of the contract was premature and unjustified.

[18, 19] Accordingly, defendant's repudiation constituted an anticipatory breach, and plaintiff is entitled to recover damages therefore. Commonwealth Trust Co. of Pittsburgh v. Hachmeister Lind Co., 1935, 320 Pa. 233, 181 A. 787. The party so injured is entitled to recover such amount as will place him in the position he would be in had the contract been fully performed, that is, the value of the performance of the contract. Macan v. Scandinavia Belting Co., 1919, 264 Pa. 384, 392, 107 A. 750, 5 A.L.R. 1502; Keller v. Gomery-Schwartz Motor Car Co., 1916, 253 Pa. 507, 98 A. 690; Jaeger Machine Co. v. L. B. Smith, Inc., 1941, 144 Pa.Super. 488, 19 A.2d 750; Restatement, Contracts, Sections 331–333; 5 Williston, Contracts (1937) Sections 1338, 1339 and 1346A.

---

[2] The same priority was used to fill the Ebbs & Son order.

■ The plaintiff here, however, seeks to recover only commissions lost on three orders taken by him but not communicated to the defendant because of defendant's repudiation. One of these orders was taken by plaintiff before the defendant's act of termination, and as to this order, I think it plain that plaintiff is entitled to his commission. As stated in 1 Sutherland, Damages, 3rd Ed. (1903) page 215:

"If the agent at the time of the revocation of his authority, had agreements for sales which he could have consummated but for the wrongful act of his principal he is entitled to his commissions, if it is clear they would have been made."

The defendant here was bound to accept all orders, and this order carried a priority rating sufficiently high to enable him to manufacture the equipment. Plaintiff therefore lost a commission he would have made but for defendant's act. See Wilson v. Wernwag, 1907, 217 Pa. 82, 66 A. 242, 10 Ann.Cas. 649; Restatement, Contracts, Section 331.

■ The remaining two orders were received by the plaintiff within a short time after November 10, 1943, when his authority under the contract was terminated. As to these, the evidence is that negotiations were begun, both as to the Farmers Produce Co. and the Lansboro Produce and Hatchery Co., as early as June 9, 1943 or thereabout. The measure of damages, as I have stated, for the repudiation by defendant, is the value of the contract right, and the plaintiff may show what gains he could have made or the profits he lost. Macan v. Scandinavia Belting Co., supra; Restatement, Contracts, Sections 329 and 331, and note comment (e) thereto. Plaintiff seeks to recover the commissions on these orders as gains prevented by the defendant's breach. Since all the work to obtain these orders had been done before the repudiation, and it appears that these orders were received as a result of such work, it seems to me that the plaintiff is entitled to damages for the prevention of the gains on these orders. The damages here amount to his commissions in view of the failure of defendant to produce any evidence in mitigation thereof.

Finally, plaintiff's claim for damages extends to sales made by the defendant himself during the full contract period from 1943 to 1944. This claim is based upon the contention that the contracts gave to ·Albright an exclusive right to sell, thus precluding sales by the defendant.

■ On this issue, it may be noted that in Pennsylvania a distinction is drawn between an exclusive agency to sell, which merely prohibits the appointment of another agency to sell, and an exclusive right to sell. Turner v. Baker, 1909, 225 Pa. 359, 74 A. 172; Dain v. Loeffler, 1917, 256 Pa. 319, 100 A. 888. Moreover, an exclusive right to sell may be acquired only by a contract in "unequivocal terms or by necessary implication." Wilson v. Franklin, 1925, 282 Pa. 189, 127 A. 609. The defendant, however, admits that the contract is one for an "exclusive agency" but denies that it goes so far as to exclude sales made by himself. The plaintiff seeks to establish his exclusive right particularly on Paragraph 2(a) and (b) of the contract of May 6, 1943.

■ Generally, in Pennsylvania, if the construction of a contract is doubtful, the doubt is thrown against the party who prepared the agreement. Wilson v. Franklin, supra. Here, the agreements were drawn by plaintiff's attorney. However, all contracts "must be construed with reference to their subject-matter and obvious purpose, and however general the language may be, their scope and effect are necessarily limited and controlled thereby." Schnee v. Elston, 1930, 299 Pa. 100, 106, 149 A. 108, 109.

In the instant case, the contracts are contracts of manufacturer and distributor providing, on the one hand, for the manufacture of poultry processing equipment by defendant and, on the other hand, for its distribution and sale by the plaintiff. The preamble to both contracts makes this apparent immediately. There is no limitation to the plaintiff's territory. Plaintiff was charged with doing the advertising, setting up a sales office and training and financing salesmen. All of which, according to the record, he did. Moreover, he was to furnish blueprints, drawings and all information possible to aid in the improvement of the equipment subject to the agreement. In addition, he was to set aside 2% of the net amount of all sales for advertising purposes. The defendant, on the other hand, agreed to place all of the sales in the plaintiff. This was to include all machines manufactured by defendant or made with his direction either directly or indirectly. He was to refer all inquiries to

the plaintiff, to quote only the prices as directed by plaintiff, to send exact copies of each and every invoice and shipping notice covering all equipment and all repair parts, and to set aside 2% of the net sales of all equipment.

In view of these contract provisions, I think plaintiff had an exclusive right to sell. The defendant was to devote his time to the manufacturing end and the plaintiff to the sales and distribution end of the business. The defendant effectively put all sales of all his manufactured products in the plaintiff. See Norris v. Clark, 1885, 33 Minn. 476, 24 N.W. 128; Restatement, Agency, Section 449, Comment (b). The instant case differs from Dahath Electric Co. v. Suburban Electric Development Co., 1938, 332 Pa. 129, 2 A.2d 765, in that there were no words in the contract capable of being construed as granting even an exclusive agency.

However, since plaintiff's license under the Whistler patent expired on November 9, 1943, he is not entitled to recover damages for sales of Whistler machines made by defendant after that date.

The plaintiff, in my opinion, is entitled to an accounting of the sales made by the defendant during the full term of both contracts as stated above. He is entitled to the full agreed compensation thereon up to the date of the termination of the contract of May 6th by the defendant, and to the date on which the contract of May 7th expired. Morrow-Smith Co. v. Cleveland Traction Co., 1929, 296 Pa. 377, 145 A. 915.

Since the termination of the contract of May 6th by the defendant was without cause, the plaintiff is entitled, as I have already pointed out, to the value of the performance of the contract, and the sales made by the defendant is evidence thereof; hence, plaintiff is entitled to recover commissions on those sales less expenses he would have had in making such sales, that is, he is entitled to the net profits he would have made. Jaeger Machine Co. v. L. B. Smith, Inc., supra; see E. J. Brach & Son v. Stewart, 139 Miss. 818, 104 So. 162, 41 A.L.R. 1172, 1175; 5 Williston, Contracts (1937) Sections 1346A and 1406; 2 Amer.Juris., Agency, Section 309.

Having given careful consideration to the evidence and the contentions of the parties, I make the following

## Findings of Fact

1. The plaintiff, E. J. Albright, is a citizen of the State of Illinois.

2. The defendant, George W. Kalbitzer, Jr., trading as National Manufacturing Co., is a citizen of the Commonwealth of Pennsylvania.

3. The amount in controversy exceeds, exclusive of interest and costs, $3,000.

4. On May 6, 1943, the parties entered into a written agreement providing for the sale by plaintiff of all poultry and egg processing and handling equipment and poultry eviscerating equipment manufactured by the defendant. The term of the agreement was for one year.

5. On May 7, 1943, the parties executed a supplemental agreement providing for the manufacture by defendant and the distribution and sale by plaintiff of certain machines collectively referred to as Whistler Picking machines. The term of this agreement was subject to the term of a license held by Albright from the Whistler Picking Machine Co. of Philadelphia.

6. Kalbitzer wrote Albright a letter dated November 10, 1943, terminating the agreement of May 6, 1943, on the ground that Albright failed to meet the requirements of Paragraph 2(f) thereof.

7. Albright's license from the Whistler Picking Machine Co. came to an end on or about November 9, 1943.

8. Albright carried out all the obligations imposed upon him by the aforesaid contracts.

9. Albright received commissions due him on two orders: Ebbs & Son and Chicago Food Products.

10. Kalbitzer failed to ship certain orders taken by Albright and accepted by him, viz., the order of September 25, 1943, the order of the R. H. Macy Co., the order of June 22, 1943 and the order of the Bergen Kleifgen Co.

11. Albright was the efficient cause of the sale to Dorset Foods, Long Island City, New York. He received no commission therefor.

12. Albright made a sale to one Rabinowitz in May, 1943, whom defendant released from his contractual obligations for the sum of $750. Albright received no commission therefor.

13. Albright made three sales which he did not send to the defendant, Kalbitzer, because of the latter's termination of the contract on November 10, 1943.

14. Kalbitzer did not place all sales of all of the poultry and egg processing and handling and poultry eviscerating equipment in the plaintiff Albright, but Kalbitzer made sales himself.

15. Kalbitzer failed to set aside 2% of the net sales of such equipment and to advance to Albright the sum of $200 for advertising expenses.

16. Kalbitzer failed to send Albright exact copies of each and every invoice and shipping notice covering all of said equipment and all repair and replacement parts for said equipment.

Accordingly, I state the following

## Conclusions of Law

1. This Court has jurisdiction over the parties and the subject matter.

2. Defendant Kalbitzer's termination of the contract on November 10, 1943, was without cause.

3. Plaintiff Albright is entitled to commissions on orders taken and sent to defendant but which defendant did not ship.

4. Plaintiff Albright is not entitled to commissions on purchases made by himself.

5. Plaintiff Albright is entitled to commissions on orders taken but not sent to defendant because of defendant Kalbitzer's unwarranted termination of the contract of May 6, 1943.

6. Plaintiff Albright is entitled to an accounting of sales made by defendant Kalbitzer of items covered by the agreement of May 6, 1943, for the full term thereof, and for the items covered by the agreement of May 7, 1943 for the term thereof.

An Order may be entered in accordance with this Opinion.

## Appendix

### Agreement

This Agreement, made in the City of Philadelphia, State of Pennsylvania, by E. J. Albright, 110 N. Franklin Street, Chicago, Illinois, (hereinafter referred to as "Albright"), and George W. Kalbitzer, Jr., individually and trading as National Manufacturing Company, of Paoli, Pennsylvania (hereinafter referred to as "Company"),

Whereas, the Company has the facilities for the manufacturing of metal equipment at Paoli, Pennsylvania, and

Whereas, Albright has the experience and means of selling poultry and egg processing equipment, poultry and egg handling equipment, poultry eviscerating equipment, and is desirous of selling the equipment above stated which will be manufactured by Company,

Now therefore, it is mutually agreed, as follows:

1. Albright agrees to immediately set up and maintain a sales office in Chicago, Illinois, to promote the sale of poultry and egg processing equipment, poultry and egg handling equipment, poultry eviscerating equipment which will be manufactured by Company.

2. Albright agrees

(a) To set aside 2% of the net amount of all sales made on the above equipment and use this fund for advertisement purposes. Albright agrees to arrange for and have printed circulars, price lists, and other sales material that will be used in the sale of this equipment.

(b) To furnish blue prints, drawings, and all information possible to aid in the improvement of the above mentioned equipment and to charge the material so furnished at cost to Company.

(c) To promptly follow by letter and personal call where possible all inquiries referred to him and to follow all mail inquiries to the best of his ability.

(d) To train and finance salesmen to promote and merchandise the above mentioned equipment, as conditions warrant.

(e) To sell the above eviscerating equipment, replacement and repair parts on a maximum profit of 25% where Company carries the account and 30% where Albright carries the account.

(f) To buy or sell for Company, an average of two eviscerating units each month, or a cumulative average total of seven thousand dollars per month of all merchandise based on the selling price to the purchaser thereof, commencing from the date of the completed installation of the first unit shipped by Company.

(g) To submit orders with preference rating high enough to permit Company to obtain the necessary material.

3. Company agrees

(a) To place all of the sales of the poultry and egg processing equipment, poultry and egg handling equipment, and poultry eviscerating equipment in Albright. This includes all such said machines manufac-

824

tured by Company or made with their direction either directly or indirectly.

(b) To set aside and to forward to Albright between the first and tenth days of each and every month so long as this agreement is in effect, an amount equal to 2% of the net sales of the above mentioned equipment. This said fund is the fund referred to in paragraph 2 of this agreement for the purpose of advertising the various equipment set forth. Company agrees to advance to Albright at the execution of this agreement the sum of $200.00 for the purpose of the said advertisement fund. Such fund is to be repaid to Company from time to time out of the above mentioned 2%.

(c) To carry the account on the above mentioned equipment, attend to the billing, collecting and all other necessary work for a maximum charge of 5% of the sales.

(d) To refer all inquiries upon the above mentioned equipment to Albright, and to quote only the prices as directed by Albright. Company further agrees to take all orders for the said equipment and to give all possible aid to Albright to secure business accounts.

(e) To send to Albright daily exact copies of each and every invoice and shipping notice covering all of said equipment and all repair and replacement parts for said equipment.

(f) To remit to Albright in full, between the first and tenth days of each month all commissions and funds due to Albright under this contract covering the sales and dealings for the previous month thereto.

4. The term of this agreement shall be for one year and shall be renewable for the additional term agreed upon by the parties hereto, in writing.

5. That full and accurate accounts of the transactions under this agreement shall be kept in proper books by each of the parties hereto; that the books shall be kept at the place of business of each of the parties, and each shall, at all times, have access to, and may inspect and copy, any of them.

In Witness Whereof, the parties hereto have hereunto set their hands and seals the 6th day of May, A.D., 1943.

(Sgd.) E. J. Albright (Seal)
E. J. Albright
and
National Manufacturing Company
By: Geo. W. Kalbitzer, Jr. (Seal)

Agreement

This Agreement, made in the City of Philadelphia, State of Pennsylvania, by E. J. Albright, 110 N. Franklin Street, Chicago, Illinois (hereinafter referred to as "Albright"), and George W. Kalbitzer, Jr., individually and trading as National Manufacturing Company, of Paoli, Pennsylvania (hereinafter referred to as "Company"),

Whereas, the Company and Albright have entered into and executed an agreement on May 6, 1943 for the manufacturing and sale of poultry and egg processing equipment, poultry and egg handling equipment, poultry eviscerating equipment, and the distribution thereof, and

Whereas, the said parties hereto are desirous of further entering into a supplemental agreement for the manufacture, sale and distribution of Whistler Picking Machines,

Now, therefore, it is mutually agreed, as follows:

1. Company agrees to manufacture and ship for Albright Whistler Picking Machines at the following rate:

| Cadet model | $130.00 |
| Super Cadet | 185.00 |
| Universal | To be agreed in writing |

The aforegoing prices are the amounts for which Company will charge and bill Albright for the manufacturing of the said machines.

2. Albright agrees to sell the Whistler Picking Machines at the following rate:

| Cadet model | $250.00 |
| Super Cadet | 335.00 |
| Universal | 435.00 |

3. Company agrees to bill Albright for the above prices twenty days net.

4. Upon replacements, of fingers, clips, repair parts, etc., the parties hereto agree that these items are to be stocked by Company and shipped by Company. Company shall remit to Albright one-half of the profit derived from the sales thereof of all such items shipped by Company after the deduction of royalty and actual net cost of the items.

5. This agreement shall be subject to the term for which Albright has as the licensee of patent from the Whistler Picking Machine Company, of Philadelphia, Pennsylvania.

6. The terms and conditions of the contract between the parties hereto for the manufacturing and sale of poultry and egg processing equipment, poultry and egg handling equipment, poultry eviscerating equipment of May 6, 1943 shall apply except where the provisions as set forth in this agreement conflict therewith, in which event the agreement set forth in this agreement shall govern.

In Witness Whereof, the parties hereto have hereunto set their hands and seals the 7th day of May, 1943.

```
    (Sgd.)   E. J. Albright        (Seal)
             E. J. Albright
                  and
    National Manufacturing Company
    By:  Geo. W. Kalbitzer, Jr.   (Seal)
```