H. I. STAHLMAN, Jr., General Partner, and wife, Mrs. J. S. Stahlman, Limited Partner, d/b/a Stahlman Lumber Company, Ltd., Appellants,

v.

NATIONAL LEAD COMPANY, Appellee.

No. 19994.

United States Court of Appeals
Fifth Circuit.

May 17, 1963.

---

**390**

L. Bryan Dabney, Lucius Dabney, Jr., Vicksburg, Miss., Leonard E. Choate, Beaumont, Tex., Dabney & Dabney, Vicksburg, Miss., of counsel, for appellants.

Frank E. Everett, Jr., and C. Delbert Hosemann, of Brunini, Everett, Grantham & Quin, Vicksburg, Miss., for appellee.

Before PHILLIPS,* CAMERON and WISDOM, Circuit Judges.

PHILLIPS, Circuit Judge.

The Stahlman Lumber Company[1] brought this action against the National Lead Company, Inc.[2] to recover damages for alleged breach of contract. From a summary judgment in favor of National, the Lumber Company has appealed.

National is a New Jersey corporation, authorized to transact business in Mississippi. The Lumber Company is a co-partnership composed of H. I. Stahlman and Mrs. H. I. Stahlman. Each of them is a citizen of Mississippi. The partnership has its principal office in Natchez, Mississippi.

From the allegations of the pleadings and exhibits attached thereto and the testimony of H. I. Stahlman by deposition, which allegations, exhibits and testimony were admitted to be true for the purposes of the motion for summary judgment, from answers to interrogatories and requests for admissions, and from documents produced and exhibits offered and admitted to be correct, the following uncontroverted facts appeared.

On April 3, 1946, the Lumber Company and Baroid Sales Division[3] of National entered into a written consignment contract, under which the Lumber Company became a distributor on consignment of specified Baroid products, to be shipped from time to time to Natchez, Mississippi, and Waterproof, Louisiana, "and/or to such other location or locations as may hereafter be mutually agreed upon."

The contract authorized the Lumber Company to sell such consigned products. However, it provided that title to all such products should always remain in Baroid until sales thereof had been consummated, that title to proceeds from sales thereof should remain in Baroid until such proceeds had been accounted for and paid to Baroid by the Lumber Company and that title to such products should pass directly from Baroid to the purchaser thereof when sold in the manner and upon the terms set forth in the contract and not otherwise; that the Lumber Company would receive and accept such consigned products and hold the same as the property of Baroid and exercise diligence in the care thereof; that Baroid from time to time would provide the Lumber Company with a schedule of prices for which all such products should be sold and that the Lumber Company would sell all such products at such prices; that the Lumber Company would collect for and in behalf of Baroid all bills and accounts for such products sold and pay the same to Baroid in accordance with rates specified in such price schedules as "price to distributors" or "list

---

* Of the Tenth Circuit, sitting by designation.

1. Hereinafter called the Lumber Company.

2. Hereinafter called National.

3. Hereinafter called Baroid.

price less distributors' discount"; and that Baroid reserved the right to limit the quantity of products to be placed on consignment with the Lumber Company.

On May 20, 1954, a map was prepared on which 15 counties in southwestern Mississippi and three parishes in Louisiana were outlined or marked off. It was labeled "Protected Area—Stahlman Lumber Company" and contained the following statement in the margin: "This area includes" (here followed the names of the three Louisiana parishes and the 15 Mississippi counties) and it was signed by Baroid and the Lumber Company and dated May 20, 1954. Baroid's letter transmitting the map to the Lumber Company described it as a map "covering your area of operations."

At the time the written contract was entered into and continuously thereafter, there were other distributors handling and distributing in the area delineated on the map the same kind of Baroid products that the Lumber Company was distributing, as Baroid's agent, in such area.

The contract provided for its modification by subsequent mutual agreement as to specific physical locations of stock points, but it contained no other provision for modification.

The contract provided it should remain in force for one year and thereafter until terminated by either party, as provided therein, and that it could be terminated by either party upon 30 days' written notice to the other party.

About May 29, 1958, the Lumber Company received a registered letter from Baroid, confirming the latter's intention, previously expressed to the Lumber Company and in keeping with a new policy it had adopted, to engage in direct distribution of its products in all areas. It enclosed a copy of a proposed notice of termination of contract, to be sent thereafter to the Lumber Company and all other distributors, and advised the Lumber Company to "lay plans for the orderly closeout of (its) consigned stocks and termination of (its) contract."

On June 27, 1958, Baroid forwarded a letter to the Lumber Company, which gave formal notice of the termination of the contract by Baroid, to take effect 90 days from July 1, 1958, instead of the 30-day period fixed by the contract. Twice, theretofore, the Lumber Company had been forewarned by Baroid that the contract would be terminated.

The closeout program was carefully set forth in the letter. Under it, Baroid would "engage in the direct distribution" of its "products in all areas," and would establish its "own channels of distribution." Baroid would aid the Lumber Company "in every reasonable way to make the transition." The Lumber Company was granted an option to extend the effective date of the termination for an additional 90 days from September 30, 1958. The written consignment contract was to continue through the termination period and any extension thereof. No mention was made of any oral agreement. Current consigned stock inventories were to be maintained "at a minimum." Products to fill "unexpected demand" during the 90-day period, or the additional extended 90 days, could be obtained by the Lumber Company, at no extra cost to it, from the nearest "company-owned stock." Baroid chemicals which were not consigned stock were to be repurchased by Baroid from the Lumber Company at its cost, plus transportation. Baroid was to lend every reasonable aid to an orderly closeout of stocks and termination of the contract.

The new policy of direct sales adopted by National was nationwide in its scope. It contemplated a termination of all distributors' contracts, not alone the Lumber Company's.

The Lumber Company availed itself of the terms of termination and exercised its option to extend the date of termination for an additional 90 days "in accordance with your (Baroid's) letter dated June 27, 1958."

The option was exercised by the Lumber Company with full knowledge and understanding that there would be in

existence during the additional 90 days "company-owned stock" from which Baroid would engage in direct sales. On July 20, 1958, before the Lumber Company exercised its option to extend, Baroid was selling directly at Port Gibson, within the area delineated on the map, and the Lumber Company made purchases from such direct sales outlet. During the 180-day termination period, the Lumber Company also made other purchases from Baroid's direct sales stocks in such area at Brookhaven and Natchez.

In its original complaint, the Lumber Company sought recovery on the theory that the written contract and map gave it an exclusive sale franchise in the parishes and counties listed on the map. By an amended complaint and amendments thereto, the Lumber Company abandoned its original theory and sought recovery by reason of an alleged oral agreement, modifying and supplementing the written contract, whereby it was to be the "principal distributor" in the area delineated on the map, of Baroid products. In its amended complaint, the Lumber Company in part alleged that after February 18, 1947, and prior to January 1, 1950, at a time when the Lumber Company was handling both Baroid products and competitive products of other manufacturers, the Lumber Company and Baroid entered into an oral agreement, whereby the Lumber Company agreed to stop handling and selling such competitive products and in consideration therefor, Baroid agreed that it would appoint the Lumber Company its "principal distributor" in the State of Mississippi and the parishes in Louisiana listed on the map; that it was further mutually understood and orally agreed that the phrase "principal distributor" meant that before Baroid would appoint a new distributor, or place or open a new stockpoint or store in the area delineated on the map, when Baroid "thought business justified" opening such new stockpoint or store in such area, Baroid would first notify the Lumber Company and it would have the prior right or privilege of establishing same, but that if the Lumber Company did not wish so to do, Baroid would have the right or privilege to have another person or distributor establish such store or stockpoint; that in accordance with such oral agreement, the Lumber Company stopped handling and selling such competitive products; that a dispute arose between the Lumber Company and Baroid as to the exact area in which the Lumber Company was to be the "principal distributor" and on May 20, 1954, in consideration of compromising and settling such dispute and the relinquishment of the Lumber Company's claim to all of the State of Mississippi, it was agreed that the Lumber Company would be the principal distributor in the parishes and counties listed on the map.

In his deposition, H. I. Stahlman testified that his understanding of the terms of the alleged oral agreement was that there would be no new distributors in the area "besides ourselves" and "as the other distributors that were here, * * * dropped off, they were to be turned out"; that "there would be no other distributors opened," but "the ones that were here would be allowed to remain"; that if Baroid wanted additional "representation within the area" it would be offered to the Lumber Company; that if the Lumber Company did not take it, Baroid would have the right and privilege to appoint a new distributor; and that it "was to be a permanent type of arrangement," as long as the Lumber Company complied with the "contractual relations" and that it "would be a continuing process down through the years."

The Lumber Company contends that under the written contract, the map, and the subsequent oral agreements, it had *an exclusive agency* * within the counties and parishes listed on the map and that Baroid was precluded from directly selling its own products in competition with the Lumber Company within the said

---

* Italics ours.

area during the closeout period;[4] and that Baroid breached its contract in not offering new direct sales stores to the Lumber Company during such closeout period. It sought commissions or reasonable profits on Baroid's sales from its own stores in the area during the closeout period.

If the allegations in the Lumber Company's pleadings are liberally construed in its favor and if full sweep and effect be given to the testimony of H. I. Stahlman in his deposition, the fact still remains that the alleged oral agreement, oral compromise agreement and map did not change the basic relationship between Baroid and the Lumber Company, as established by the written agreement. The products were still to be consigned by Baroid to the Lumber Company and held by it as Baroid's products. Title to the products was still at all times to remain in Baroid until a sale thereof was consummated. Title to the proceeds of sales was still to remain in Baroid until they were accounted for and paid by the Lumber Company to Baroid. The sales of the consigned products were still to be made by Baroid to purchasers, by the Lumber Company acting as Baroid's agent, and title was to pass directly from Baroid to such purchasers and not through the Lumber Company. The relationship of principal and agent created by the written contract remained unchanged. Indeed, the Lumber Company,

in its reply to the motion for summary judgment, asserted that such was the relationship and that "the contract was one of agency and not of sale."

The most that can be said is that the oral agreements and the map gave the Lumber Company a *qualified exclusive agency* within the area embraced by the counties and parishes listed on the map. That is, within such area other existing agents, whose agencies were terminated, were not to be replaced and the Lumber Company was to be given the option to act as distributor at new stockpoints to be established and other distributing agents were not to be established at such new stockpoints, unless the Lumber Company refused to undertake such distribution at such points.

The adjudicated cases make a distinction between (1) *an exclusive agency to sell*, as the agent of the principal, products of the latter in a specified territory, and (2) *the exclusive right to sell* the products of a principal in a specified territory.[5]

■ Although, under a contract giving an exclusive agency, the principal is precluded from appointing another agent to sell his products in the specified territory, he may sell directly to a purchaser within such territory.[6]

■ Under a contract giving such an exclusive right to sell, the principal may not sell his products in the specified ter-

---

4. "Closeout period" means the period between the giving of the notice of termination and December 31, 1958.

5. 2 Am.Jur., Agency § 307, p. 240; Restatement, Agency, § 449, Comments a. and b.; Cases cited in Notes 6 and 7, infra; Notes: 10 A.L.R. 814, 816; 20 A.L.R. 1268, 1270; 12 A.L.R.2d 1360, 1363.

6. Harcourt v. Stockton Food Products, 113 Cal.App.2d 901, 249 P.2d 30, 33; Wilck v. Herbert, 78 Cal.App.2d 392, 178 P.2d 25, 37, 38; Snook v. Page, 29 Cal.App. 246, 155 P. 107; Faith v. Meisetschlager, 45 Cal.App. 7, 187 P. 61; Dreyfus v. Richardson, 20 Cal.App. 800, 130 P. 161, 162; Smith v. Preiss, 117 Minn. 392, 136 N.W.

7, 8; Dallas Electric Supply Co. v. Branum Co., 143 Tex. 366, 185 S.W.2d 427, 430, 431; Baker v. Skipworth, Tex. Civ.App., 244 S.W.2d 299, 300; J. I. Case Threshing Mach. Co. v. Wright Hardware Co., 61 Tex.Civ.App. 481, 130 S.W. 729; Ballard v. Tingue Mills, D.C. Conn., 128 F.Supp. 683, 689; Albright v. Kalbitzer, D.C.Pa., 62 F.Supp. 815, 821; Gilbert v. Coons, 37 Ill.App. 448, 449; White Co. v. White Motor Co., 159 App.Div. 716, 144 N.Y.S. 960, 961; Golden Gate Packing Co. v. Farmers' Union, 55 Cal. 606, 607; Davis v. Van Tassel, Sup., 107 N.Y.S. 910, 911; Harris v. McPherson, 97 Conn. 164, 115 A. 723, 724, 24 A.L.R. 1530.

ritory, directly or through another agent.[7]

■ An intent to give an agent an exclusive right to sell in a specified territory must appear from unequivocal terms or by necessary implication.[8]

■ The written contract, as supplemented by the alleged oral agreements and map, did not by express terms or by any reasonable implication that may be drawn therefrom, give the Lumber Company the exclusive right to sell the products of Baroid within the parishes and counties listed on the map.

■■ Section 264, Mississippi Code of 1942, in part here pertinent, reads:

"An action shall not be brought whereby to charge a defendant or other party:

\* \* \* \* \* \*

"(d) Upon any agreement which is not to be performed within the space of fifteen months from the making thereof;

\* \* \* \* \* \*

"Unless, in each of said cases, the promise or agreement upon which such action may be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some person by him or her thereunto lawfully authorized in writing."

The Lumber Company's claim, under its amended complaint and amendments thereto, rests upon the alleged oral agreements set forth therein. Such agreements change the time of duration of the contract and form the only possible basis for the Lumber Company's claim of exclusive rights.

H. I. Stahlman testified that under the terms of the oral agreements the principal distributor arrangement was to be permanent; that Baroid's representative told him "that this was to be a permanent type of arrangement" as long as Stahlman (the Lumber Company) "complied with the contractual relations" and that he understood it "would be a continuing process down through the years."

In Gerachi v. Sherwin-Williams Company, 156 Miss. 36, 125 So. 410, the appellants (Gerachi and another) were doing a drug business in the City of Vicksburg. By the terms of an oral contract, the appellants were given an exclusive right to handle the products of Sherwin-Williams in the Vicksburg area. The facts, with respect to the time the arrangement was to continue, were strikingly like the facts in the instant case. There, the appellants testified that the representative of Sherwin-Williams "told them their agency, or exclusive sales arrangement, would be permanent, and that they understood that it would endure forever so long as they paid their bills." The Mississippi court held in the Gerachi case that the verbal contract was not intended to be performed within 15 months and was within sub-section (d) of § 264, supra. Mississippi law controls, and on authority of the Gerachi case we hold the verbal contracts in the instant case were not intended to be performed within 15 months and were within the Mississippi Statute of Frauds.

■■ While a written contract may be modified by a subsequent oral agreement, the latter must be supported by a valid consideration,[9] and such oral agreements are not enforceable when within the Statute of Frauds, absent a written

7. Harcourt v. Stockton Food Products, 113 Cal.App.2d 901, 249 P.2d 30, 33; Wright v. Vernon, 81 Cal.App.2d 346, 183 P.2d 908, 909; Blankenship v. Kiehne, 240 Mo. App. 1197, 225 S.W.2d 166, 169; Lewis v. Smith, Tex.Civ.App., 198 S.W.2d 598, 600; Baker v. Skipworth, Tex.Civ.App., 244 S.W.2d 299, 300; Harris v. McPherson, 97 Conn. 164, 115 A. 723, 724, 24 A.L.R. 1530.

8. Wilson v. Franklin, 282 Pa. 189, 127 A. 609; Albright v. Kalbitzer, D.C.Pa., 62 F.Supp. 815, 821; Ritch v. Robertson, 93 Conn. 459, 106 A. 509, 510, 7 A.L.R. 81.

9. Edrington v. Stephens, 148 Miss. 583, 114 So. 387, 389; Pritchard v. Hall, 175 Miss. 588, 167 So. 629, 631.

memorandum which meets the statutory requirements.[10]

The record clearly shows that at the time of the hearing on the motion for summary judgment, the Lumber Company had brought before the lower court every writing on which it intended to rely as a memorandum or note taking the oral agreements outside the Statute of Frauds.

Under the Statute, the writing or writings relied upon must be signed by the party to be charged, and under Mississippi law must be delivered to the other party.[11]

Many of the writings on which the Lumber Company relies were from the files of National or Baroid and had never been delivered to the Lumber Company.

The memorandum "must contain the substantial terms of the contract expressed with such certainty that they may be understood from the contract itself, or some other writing to which it refers, without resorting to parol evidence." [12]

While the memorandum may consist of several writings, the signed memorandum must refer to any unsigned writings relied upon, either expressly, or by internal evidence clearly showing the unsigned memorandum is necessarily incorporated into the signed memorandum.[13]

Many of the writings relied on by the Lumber Company did not meet that requirement.

It is settled law in Mississippi that part performance will not take a case without the Statute of Frauds.[14]

Under Mississippi law and the weight of authority,[15] an oral contract, which, by its terms, is not to be performed within the statutory period (here, 15 months), or where the parties intend that it shall continue in operation beyond the statutory period, is not taken without the Statute by a provision that it may be terminated by either party within such period. In Fireman's Fund Ins. Co. v. Williams, 170 Miss. 199, 154 So. 545, 546, the court said, with respect to a contract which could be terminated on 10 days' notice by either party, "the termination of such a contract is not performance of it, but is a mere frustration thereof."

We have carefully considered all of the writings relied on by the Lumber Company to take such oral agreements outside of the Statute of Frauds. They fall far short of meeting the requirements of § 264, supra, as construed by the decisions of the Supreme Court of Mississippi, with respect to a written memorandum.

We conclude, as did the trial court, that under the allegations and proof, the Lumber Company did not acquire an exclusive right to sell the products of Baroid in the parishes and counties listed on the map and could not recover damages by reason of direct sales made by Baroid prior to the termination of the contract, and further, that the claim of the Lumber Company rested and depended on the alleged oral agreements and that the Lumber Company was precluded from enforcing such agreements by the Mississippi Statute of Frauds.

Affirmed.

10. Commercial Credit Corporation v. Long, 225 Miss. 164, 82 So.2d 847, 848.

11. Howie v. Swaggard, 142 Miss. 409, 107 So. 556, 557; Jelks v. Barrett, 52 Miss. 315, 323; Johnson v. Brook, 31 Miss. 17, 19.

12. Waul v. Kirkman, 27 Miss. 823, 828; Kervin v. Biglane, 144 Miss. 666, 110 So. 232, 233.

13. Ludke Electric Company v. Vicksburg Towing Co., 240 Miss. 495, 127 So.2d 851, 854.

14. Poole v. Johns-Manville Products Corp., 210 Miss. 528, 49 So.2d 891, 893, and cases there cited; Howie v. Swaggard, 142 Miss. 409, 107 So. 556.

15. Fireman's Fund Ins. Co. v. Williams, 170 Miss. 199, 154 So. 545, 546; 37 C.J.S. Frauds, Statute of § 48, p. 556.