[Civ. No. 15140.   Second Dist., Div. Three.   Mar. 5, 1947.]

LAURA WILCK, Plaintiff and Appellant, v. F. HUGH HERBERT, Defendant and Appellant.

Haight, Trippet & Syvertson for Plaintiff and Appellant.

Gang, Kopp & Tyre and Hanna & Morton for Defendant and Appellant.

WOOD, J.—In this action for damages for breach of contract, the plaintiff obtained judgment for $36,312. Trial was by jury. Plaintiff appeals from the judgment, limiting her appeal to the question of inadequacy of the amount of damages awarded. Defendant appeals from the judgment, and from the order denying his motion for judgment notwithstanding the verdict.

The amount of the award to plaintiff was a percentage of the income received, and to be received, by defendant from the first class or stage production of a play entitled ''Kiss and

Tell," which he had written. A contention of plaintiff is that, under her contract with defendant, she was also entitled to a percentage of the income received, and to be received, by defendant from the motion picture production of the play, and the court erred in instructing the jury that such income should not be considered in computing damages. A part of her argument is that, under the contract, she was the exclusive agent for the sale of the production rights, and the evidence as to whether another agent, rather than defendant himself, sold the motion picture rights, during the term of her contract, was such that the issue should have been submitted to the jury. Defendant pleaded, among other things, that there was no consideration for the contract, that plaintiff was discharged for cause, and that she abandoned the contract. The jury impliedly found against defendant upon those issues, having rendered a verdict in favor of plaintiff. Some of the contentions of defendant on appeal are: that there was no consideration for the contract, particularly since the expressed consideration related to a past and completed transaction; that the contract was unilateral; that there were no reciprocal covenants therein; that although, under the provisions of the contract, plaintiff was his exclusive agent, she did not have the exclusive right to sell the production rights to the play, but that he also had the right to sell them.

By reason of the issues on these appeals, and the involved transactions herein, it is necessary to make a detailed statement of facts. Plaintiff will be referred to as Wilck, and defendant will be referred to as Herbert.

Plaintiff is in the business of representing authors, upon a commission basis, in selling their writings to publishers and motion picture companies. Defendant is an author of plays. They became acquainted about 1926 in New York City where plaintiff was then maintaining her office. Soon thereafter she introduced him, in New York, to a representative of the Metro-Goldwyn-Mayer motion picture company, which company employed him as a writer, and he then came to California. She came to California in 1935, and established her office here.

In the early part of August, 1939, Herbert telephoned to Wilck and said that he had written a new play, and that he wanted her to sell it. On August 8, 1939, he read the play to her and she agreed to try to sell it. The play was originally entitled "A Glimpse of Heaven," but later the title was changed to "Quiet Please." She submitted the play to Al

Lewis, a producer, on August 12, 1939, and on the next day he agreed orally, upon terms acceptable to Herbert, to undertake to produce it in New York.

On August 17, 1939, plaintiff and defendant entered into the contract which is the basis of this action. It was prepared by plaintiff and is as follows:

> "Hollywood, Cal.
> August 17, 1939

Miss Laura Wilck
604 Equitable Bldg.
Hollywood, Cal.

Dear Miss Wilck:

"For and in consideration of your efforts in obtaining a production contract for A GLIMPSE OF HEAVEN with Mr. Al Lewis so quickly, we hereby agree to appoint you our sole and exclusive representative for the term of five (5) years from the date hereof, for any play or plays which we may write singly or together.

"That upon our submitting either singly or together any play to you, that you will within ten (10) days notify us whether you desire to handle said play. In the event that you reject said play, we shall be at liberty to submit it elsewhere without any further claim on your part.

"That the play or plays that you do handle, you promise to use your best efforts to sell to the best advantage; and that you shall submit to us any offer you may be able to obtain, but no agreement shall be binding upon us without our signatures.

"That you shall be entitled to receive as commission as said representative, ten (10%) per-cent of all monies to accrue to us singly or together, under or by virtue of any contract effected, for which negotiations may have been carried on, within the term of this agreement.

"And we hereby give our authority to collect all monies to accrue to us in or by virtue of any contract that may be negotiated under this agreement and shall pay over all such monies, less commissions, promptly to us, as and when received, together with box-office statements.

"And that this shall be binding upon all parties concerned in this agreement and equally upon their successors in title, except that you shall not assign our representation herein granted, without our written consent.

"This is our entire understanding and your signature under the word 'Accepted' shall constitute an agreement between us.

Sincerely yours,

F. Hugh Herbert   (Signed)
Hans Kraly

Accepted:
Laura Wilck     (Signed)
Laura Wilck.''

A question arises herein as to whether ''a production contract'' with Lewis had been obtained, as stated in the contract just quoted, prior to the time that contract was made. Herbert asserts that the contract had been obtained previously, as recited in the contract, when Lewis agreed orally regarding it, and therefore the expressed consideration, being a past consideration, was no consideration. Wilck asserts that it had not been so obtained, but was obtained subsequently when a written production contract was signed. By reason of such question as to when that production contract was obtained, further facts concerning the Lewis contract should be recited here. At the time Lewis agreed orally to undertake to produce ''Quiet Please,'' that is on August 13, he asked Wilck to prepare a written dramatic-production contract on the standard form of contract required by the Dramatists' Guild. Such form of contract includes the terms of the ''Minimum Basic Agreement'' as to royalties to be paid to the author, and includes a provision as to the agent's commission. The guild receives the royalties from the producer, and therefrom remits the commission due to the agent and the balance of royalty due to the author. According to the rules of the Dramatists' Guild, such a contract is not effective until it is countersigned by the Dramatists' Guild, and a play cannot be produced professionally until the ''Dramatic Production Contract and Minimum Basic Agreement,'' has been executed. On August 28, 1939, the production contract was signed by Lewis and Herbert, and was forwarded to the Dramatists' Guild.

Lewis did not produce the play, and in January, 1940, he relinquished his rights under the contract. After Lewis had paid $500 for the option to produce the play, and after Wilck had assured Herbert that Lewis was financially able to produce it, and that the play was ready for rehearsal as soon as Herbert could get to New York, he went there and stayed about three weeks while Lewis tried unsuccessfully to finance

the show. After Lewis failed to produce the play, Herbert expressed to Wilck some dissatisfaction concerning her advice which, according to his testimony, caused him to go to New York and to expend considerable money unnecessarily in waiting for the production of the play. He also contended that Wilck should require Lewis to reimburse him for his expenses.

In August, 1940, Wilck sold the play to Henry Duffy, who produced it in Los Angeles for two weeks in October, and then produced it in New York for two weeks in November. It was not a success in New York, and the contract with Duffy ended. She sold the play to him again in January, 1941, but before he was ready to produce it the scenery and costumes were destroyed by fire, and he released his contract. She sold it to him again in April, 1941, and he produced it in San Francisco for three weeks in August, but it was not a success. In addition to making said sales of the play, she submitted it to 35 or 40 other producers. All royalties due to Herbert from the productions in Los Angeles and New York were paid promptly, but there was a long delay in paying a balance of $98 due from the San Francisco production, it not having been paid until December, 1942. Herbert's portion of this was $39.68, after deducting Wilck's commission and certain other charges. As a result of Duffy's failure to make the payment promptly, Herbert requested Wilck on several occasions to collect the money, and, if necessary, to enforce the collection through the Dramatists' Guild. In reply thereto she told Herbert that Duffy had had several failures recently by reason of the depression and war conditions, that he would pay as soon as possible, that since he had been a well known producer for thirty years and had produced this play three times he was entitled to some consideration, that trying to collect the small amount through the Guild would hurt Herbert's reputation, and that she was trying to protect Herbert as well as Duffy. Herbert then asked her whether she was representing Duffy or representing him. On January 2, 1942, she wrote a letter to Herbert stating that Duffy had lost a fortune in the last few weeks, and that nothing could be done about the collection of the royalties at that time.

On January 3, 1942, Herbert wrote a letter to her stating that despite repeated requests to collect the delinquent royalties that she had remained inactive thereby showing a consideration for Duffy which overshadowed her obligations to

the author; that Herbert and Kraly (his collaborator) construed her refusal "as a breach of your managerial contract with us"; that "as of this date, you are no longer authorized to represent yourself as the agent of 'Quiet Please!' in any negotiations which may arise in connection with this play." Attached to that letter was a pencil notation to plaintiff as follows: "Dear Laura: No hard feelings; just wanted to make this appropriately official." She did not reply to that letter. He did not submit any other play to her.

On March 2, 1942, about two months after Herbert had written the letter discharging her, he entered into a written contract with the Sam Jaffe Agency whereby he employed it for two years as his exclusive agent to negotiate the sale of his literary and dramatic material, and agreed to pay it for its services 10 per cent of the money received by him. The agreement was signed, on behalf of the agency, as follows: "Sam Jaffe Agency By Mary Baker."

About six months after Herbert had sent the letter discharging Wilck, they met at a motion picture studio, had lunch together, and talked about plays, but no reference was made to the letter of discharge. She asked him, at that time, when he was going to write a new play, and he said he didn't have an idea. Occasionally thereafter, during 1942, they had discussions concerning plays, written by other persons, which she submitted to him for his suggestions as to improvements thereon. In the latter part of November, 1942, she telephoned to him and said that she understood he was writing a new play, and he replied that was correct and that it was almost completed. She asked whether she was going to see the play, and he replied, according to her testimony, "Yes, some time." According to his testimony, he said that he had an agent who was handling the play and she was not going to see it. She then said that they still had a contract, and he said that she had been discharged almost a year ago. When she repeated that she still had the contract, he said he didn't have a copy of it, and she said she would send him a copy.

On December 3, 1942, she wrote a letter to him stating that she had just received the final royalty check for $98 from Duffy and that she was enclosing a check for $39.68 as Herbert's part of the royalty. At the bottom of the letter there was the following: "P. S. Is this the contract you

mean. You may keep it. I have another copy. How is the new playing coming on. I look forward to seeing it soon. Good Luck.''

On December 14, 1942, Herbert sent a letter to the Dramatists' Guild, requesting that it send to·him copies of correspondence he had had with it and Wilck concerning ''Quiet Please.'' In that letter he stated: ''I had carbon copies of all this correspondence at one time . . . it is now imperative for me to have a record of the correspondence in order for me to discharge Laura Wilck as play broker. At the time, some three or four years ago, when she first sold 'Quiet Please' to Al Lewis, I signed a managerial contract with her which Miss Wilck has breached innumerable times by neglect and nonperformance. I have completed another play, and, before proceeding further with it and turning it over to another play broker, I am naturally anxious to be clear of any legal obligations to Laura Wilck's office.''

On December 17, 1942, his attorney wrote a letter to Wilck stating: ''Mr. Herbert wishes us to make clear to you that because of your failure to perform in accordance with the terms of the contract of August 17, 1939, he some time ago terminated that agreement with respect to all plays other than the one play 'Quiet Please.' . . . The contract of August 17, 1939 has been terminated by him, and is of no force or effect whatever.''

In reply to that letter, her attorney wrote to his attorney on January 7, 1943, stating that she was out of town, but it was his understanding that ''a valid contract exists between the parties.''

About December, 1942, Herbert finished writing a new play which was entitled ''Holy Cow,'' but later the title was changed to ''Kiss and Tell.'' This play was a success and was referred to as a ''smash hit.'' At the time of the trial in March, 1945, it had been running continuously in New York as a first class or stage production for more than two years, and had been successfully produced in many cities in the United States. The total income which Herbert had received, at the time of the trial, from it as a stage production was $303,120.15. It was also produced as a motion picture at a cost of $620,000, and apparently it was a success. The record does not show the amount of income from the

motion picture. Presumably that amount was not shown because the court ruled, as above stated, that such income should not be considered in computing damages.

On January 13, 1943, Herbert sold the first-class production rights in the play to George Abbott of New York, a producer. The sale was negotiated by Mary Baker of the Sam Jaffe Agency. The production contract provided that if Abbott produced the play in New York for three weeks he would become owner of 40 per cent of the motion picture rights in the play. Beginning in March, 1943, Abbott produced the play there for more than three weeks and became the owner of such part of said rights.

On January 14, 1943, Herbert executed another agency contract with the Sam Jaffe Agency which was practically the same as the first contract with that agency, except that it was to continue for seven years instead of two years.

On July 7, 1944, the Abbott-Herbert Corporation was incorporated under the laws of California. Prior to the incorporation, Abbott transferred his rights under the production contract with Herbert to a limited partnership known as "Kiss and Tell Company," in which several persons were the limited partners, and Abbott and his daughter were the general partners.

Since the incorporation transaction, and the issuance of stock for transfer of interests in the play and for cash, have some bearing upon the question as to whether the motion picture rights were sold, and as to whether, if they were sold, the sale was negotiated by an agent or by Herbert himself, the details concerning the corporation should be stated. On July 11, 1944, Herbert became a director and vice-president of the Abbott-Herbert Corporation. On that same date the directors authorized the issuance of 600 shares of its preferred stock of the par value of $1,000 each, and the issuance of 200 shares of its common stock of no par value for $1.00 per share, as follows: 200 shares of preferred stock and 80 shares of common stock to Kiss and Tell Company in exchange for the transfer by it of its contract rights in "Kiss and Tell"; 40 shares of preferred to Kiss and Tell Company for $40,000 cash; 300 shares of preferred and 120 shares of common to Herbert for the transfer by him of the copyright and other rights to "Kiss and Tell," excepting the first-class production rights for the United States, Canada,

and Great Britain; 50 shares of preferred to Herbert for $50,000 cash; and 10 shares of preferred to Abbott for $10,000 cash.

The resolution authorizing the issuance of the stock recited that the fair value of the rights to be acquired from Kiss and Tell Company was $200,080, and the fair value of the rights to be acquired from Herbert was $300,120. The value of the stock proposed to be issued to Kiss and Tell Company and to Herbert for their respective rights in "Kiss and Tell" was in exact proportion to the value of their respective rights as determined by the resolution. In other words, Kiss and Tell Company was to receive 200 shares of preferred stock of the par value of $200,000, and 80 shares of common at the price of $80, for its rights of the asserted value of $200,080; and Herbert was to receive 300 shares of preferred stock of the par value of $300,000, and 120 shares of common at the price of $120, for his rights of the asserted value of $300,120. The additional 100 shares of preferred of the par value of $100,000, authorized to be issued, were to be sold for $100,000 cash, as shown above, as follows: 40 shares to Kiss and Tell Company for $40,000; 50 shares to Herbert for $50,000; and 10 shares to Abbott for $10,000.

On August 2, 1944, a permit to issue stock pursuant to the resolution was granted by the corporation commissioner, and later it was issued accordingly.

On August 6, 1944, Herbert, Kiss and Tell Company, and the Abbott-Herbert Corporation executed a contract whereby: (1) Herbert transferred to the Abbott-Herbert Corporation all copyrights to "Kiss and Tell" and the play itself, subject to the rights of the Kiss and Tell Company and to the rights of British producers, an Australian producer, a publisher, and the holder of an amateur production contract; (2) Herbert reserved certain rights as to use of new material; (3) Kiss and Tell Company transferred to the corporation all its rights under the production contract; (4) the corporation assumed the obligations of Herbert to pay a commission to the Sam Jaffe Agency and Mary Baker of 10 per cent of the royalties on the first-class productions, and 10 per cent of the money paid for the subsidiary rights. (The motion picture rights are known as subsidiary rights.)

On the same day last mentioned, Herbert and the corporation executed a contract whereby: (1) The corporation

retransferred to him the first-class production rights in the play for the United States, Canada, and Great Britain, and the right to make sequels; (2) Herbert agreed to pay to the Sam Jaffe Agency 10 per cent of all royalties received from the first-class rights, and he agreed to certain limitations on his rights as to new material.

On the same day, the corporation and the Sam Jaffe Agency executed a contract whereby: (1) The agency released Herbert from all obligations to pay commissions to it except as to royalties from the first-class productions in the United States, Canada, and Great Britain; (2) the agency agreed to render services to the corporation in an advisory capacity with respect to all motion pictures based upon the play, and to render the services customarily rendered by play agents with respect to the play; (3) the corporation agreed to pay the agency, in consideration of its services and in lieu of the commission agreed to be paid to the agency by Herbert, 10 per cent of the corporation's net motion picture receipts and net other receipts.

The essential results of the transactions above mentioned involving Herbert, Abbott, the Kiss and Tell Company, the Abbott-Herbert Corporation, and the Sam Jaffe Agency, are: (1) The Abbott-Herbert Corporation became vested with the right to produce "Kiss and Tell" as a motion picture; (2) Herbert and the Kiss and Tell Company each received, for the transfer of such right to the corporation, stock of the corporation of a value in exact proportion to the value of their respective interests in the right so transferred; (3) the Sam Jaffe Agency acquired the right to receive 10 per cent of the net receipts of the corporation in lieu of the right to receive from Herbert and the Kiss and Tell Company a commission of 10 per cent of any amount realized as proceeds of the motion picture rights; (it is to be noted that under the terms of the production contract between Herbert and Abbott they both designated the Sam Jaffe Agency as their exclusive agent for the sale of the motion picture rights only, and agreed to pay a commission of 10 per cent of the gross purchase price of any sale.) (4) The Sam Jaffe Agency agreed to render the customary services of a play agent with respect to the play.

About August 11, 1944, the Abbott-Herbert Corporation and Columbia Pictures Corporation executed a contract un-

der the terms of which the Abbott-Herbert Corporation has produced "Kiss and Tell" as a motion picture, and under the terms of which Columbia Pictures Corporation advanced credits in the amount of approximately $200,000 toward the cost of the production, and Abbott-Herbert Corporation advanced cash, secured from bank loans, in the amount of approximately $420,000. The said contract provided that Columbia Pictures Corporation should have the exclusive distribution rights of the picture; and that Columbia Pictures Corporation, for making available its facilities and the credits under the contract and for providing its distribution organization, would receive a percentage of the proceeds of the production of the motion picture "Kiss and Tell."

### HERBERT'S APPEAL

As above stated, Herbert contends on his appeal from the judgment that the contract of employment of August 17, 1939, is invalid and unenforceable for want of consideration. He argues that the contract is unilateral in that it is merely an option whereby she can either handle or reject the plays; that its provisions are such as to exclude the possibility of implying reciprocal obligations in that Wilck carefully and definitely protected herself against assuming any obligation until she accepted a play; that there was no extrinsic consideration to support the agreement; that the recited consideration refers to a service which Wilck had rendered pursuant to a pre-existing oral agreement; that at the time the written agreement was executed, they occupied a confidential relation, and Wilck could not acquire the advantage of an option on future plays to be written by Herbert for which she gave no consideration; that services rendered by Wilck in connection with "Quiet Please" cannot be construed as part performance, or to remedy the defect of want of consideration; and that the presumption of consideration which attaches to a written instrument has been rebutted by the evidence.

A written agreement should receive such an interpretation as will make it operative, reasonable and capable of being carried into effect, if that can be done without violating the intention of the parties, and an interpretation which gives effect is preferred to one which makes it void. (*Long Beach Drug Co.* v. *United Drug Co.*, 13 Cal.2d 158, 166 [88 P.2d 698, 89 P.2d 386].) The contract herein includes a provision that Wilck will within ten days after a play has been

submitted to her by Herbert, notify him whether she will handle the play. By reason of such provision there is an implied obligation on her part to read the plays within ten days after they are submitted to her. The fact that the matter of rejecting a play is within the discretion of Wilck does not exclude the implication of a duty to examine or read the plays submitted. She was an established literary agent and the continued existence of her business depended upon the quality of her opinions as to the merits of plays. It would seem that it was contemplated by the parties that plays submitted to her would receive careful and intelligent consideration in determining whether she would accept or reject them, and that it was not contemplated that she would reject a play in a wholly arbitrary manner without any examination or study of it. Her previous conduct with reference to her acceptance of one of his plays, namely, ''Quiet Please,'' included a reading of the play. It is obvious that the reading of the plays would be necessary in order that an intelligent acceptance or rejection might be made. There would be no object in submitting them to her unless it was contemplated that she would read or examine them. The language of the contract, the nature of the business they were engaged in, and their conduct warranted the inference drawn by the trial court and jury that there was an implied promise by Wilck sufficient to constitute a valid consideration.

Furthermore, the contract contains an express promise of Wilck to do something that she was under no legal obligation to do, namely, to notify Herbert within ten days whether she would handle a play submitted to her. Under such provision, a benefit was conferred on Herbert, in that, he was assured that a play submitted by him would not be held for an indefinite period of time, but that he would know within a short time after he submitted a play to her whether he could submit it elsewhere without interfering with her efforts to sell the play.

Wilck asserts further that the substantial services, rendered by her in behalf of Herbert after the execution of the agency contract, constituted sufficient consideration, and supplied any lack of mutuality if any existed at the inception of the contract. After the execution of the contract she sold the play, ''Quiet Please,'' three times to Duffy, and participated in trying to adjust the problems which arose in connection with the production of it by Duffy. According to her testimony,

she devoted about 40 per cent of her time from August, 1939, to August, 1940, to "Quiet Please," and during the following year about 20 per cent of her time; that her average annual expenses in her business amounted to approximately $4,000. According to her testimony, therefore, she expended about $1,600 the first year and about $800 the second year in connection with that play. Herbert argues that "Quiet Please" was never submitted to Wilck under the agency contract, that it had been submitted to her previously and had been accepted by her previously, and that her services in connection with that play "are not referable to the employment agreement." It appears from the conduct of both parties that they considered that her services in regard to "Quiet Please" were rendered pursuant to the agency or managerial contract. When Herbert wrote to the Dramatists' Guild on December 14, 1942, stating that he needed copies of his correspondence with Wilck concerning "Quiet Please" in order that he might discharge her, he wrote in part, as above quoted: "At the time . . . when she first sold 'Quiet Please' to Al Lewis, I signed a managerial contract with her, which Miss Wilck has breached innumerable times by neglect and nonperformance. I have completed another play, and, before . . . turning it over to another play broker, I am naturally anxious to be clear of any legal obligations to Laura Wilck's office." That language indicates that he considered that as to "Quiet Please" she had been acting under the contract of August 17, 1939, especially in view of the fact that at that time the production of "Quiet Please" had long since terminated and the production contracts with Lewis and Duffy relating to it had also ended. That contract of August 17, 1939, was the only written contract he had with Wilck. She was not a party to the production contract relating to "Quiet Please" which was signed by Lewis and Herbert on August 28, 1939, after Lewis had agreed orally on August 13, 1939, to try to produce that play. If her services in connection with that play were not referable to that written contract, it would seem that any neglect or nonperformance on her part with respect to "Quiet Please" would not be a breach of the managerial contract and would not furnish any basis for terminating that written agreement. Further evidence that they considered that her services respecting "Quiet Please" were rendered under the written agreement of August 17, 1939, is the letter from Herbert's attorney to Wilck, written three days after Herbert's

letter to the guild, which stated in part, as above quoted: "Mr. Herbert wishes us to make clear to you that because of your failure to perform in accordance with the terms of the contract of August 17, 1939, he sometime ago terminated that agreement with respect to all plays other than the one play, Quiet Please. . . . The contract of August 17, 1939, has been terminated by him and is of no force or effect whatever." Furthermore, in his answer Herbert pleaded that the contract of August 17, 1939, was terminated by him and that he had discharged Wilck for cause. The only cause he assigned for the discharge was her acts with reference to "Quiet Please." It appears, therefore, that after the execution of the agency contract the parties considered, throughout their dealings with respect to "Quiet Please," that they were operating under that contract.

It appears also that Wilck's efforts in Herbert's behalf were not limited to "Quiet Please." After the agency contract was executed she made efforts to sell his plays entitled; "Detour," and "Special Delivery."

Herbert refers to a provision in all the production contracts relative to "Quiet Please" to the effect that Wilck should receive 10 per cent of the royalties and advance payments as her commission, and asserts that that provision was made because she did not consider that the agency contract of August 17, 1939, applied to that play, and she therefore desired to have her right to receive the 10 per cent commission fixed in the production contract. She testified that she dictated that provision "from a memorandum given to Mr. Herbert from his lawyer." Wilck was not a party to the production contracts, as above stated, but it appears, nevertheless, that the provision therein was for her benefit and that she could rely thereon as a basis for recovering for services rendered by her. A production contract, as above stated, was not effective until it was countersigned by the guild, and under the production contracts, the guild was authorized to receive the royalties and advance payments and to pay therefrom to the agent and the author the amounts due them. One purpose of the provision relative to the agent's commission was to put the guild and the producer on notice as to the terms of the agreement between the agent and the author, and to notify the guild as to the amount of the agent's commission so that it might properly disburse the commission and royalties. Herbert argues that the agency contract was applicable to

plays to be submitted, and that since the play "Quiet Please" was submitted to her and was orally accepted by her before the agency contract was executed, the agency contract was not applicable to it. The agency contract did provide that "upon our submitting" any play that Wilck would notify Herbert and Kraly within ten days whether she would handle the play, and it is also true that Lewis had agreed orally, before the agency contract was made, to try to produce "Quiet Please." The Lewis production contract, however, terminated in January, 1940, and from that time until she sold the play to Duffy in August, 1940, and another production contract was made, she had no written contract concerning her commission unless the agency contract was such. Likewise, after the various Duffy production contracts terminated, and while she was making further efforts to sell the play, she had no written contract concerning her commission unless the agency contract was in effect. Of course, it was not necessary that she have a written contract, if she had an oral one, but the matter immediately under discussion is whether the parties considered that as to "Quiet Please" she was acting under the alleged oral contract made a few days before the agency contract was entered into or under the agency contract. It appears, as above stated, that they considered that she was acting under the agency contract. ▪ Even if a promise is unilateral in its inception, part performance by the promisee furnishes a valid consideration and cures the lack of mutuality, if any, existing originally. In *Los Angeles etc. Co.* v. *Wilshire,* 135 Cal. 654 [67 P. 1086], wherein the contract at the date of its making was unilateral, the court said at page 658: "The promised consideration had then been partly performed, and the contract had taken on a bilateral character. . . ." In *Ruess* v. *Baron,* 217 Cal. 83 [17 P.2d 119], the defendant gave plaintiff the exclusive option to buy or sell certain property within a stated period, and before the end of that period defendant terminated the agreement. The court held that originally there was no consideration, and that subsequently the only consideration was plaintiff's expense and efforts in trying to secure a purchaser. The court said therein at page 85: "But if it was purely an agency contract to sell, plaintiff's outlay and labor would supply a consideration sufficient to infuse life into the authorization until the full period named therein had expired." In *Lyon* v. *Goss,* 19 Cal.2d 659 [123

P.2d 11], the defendant obtained from plaintiff a twenty-year lease on property used as a market, and promised to pay the lessor therefor certain portions of the rentals to be received from numerous sublessees that were contemplated. After defendant had obtained sublessees, the plaintiff lessor contended that the agreement was void for want of mutuality in that it did not bind defendant to any obligation, his only promise being to endeavor to secure sublessees, and he being free to abandon the enterprise at any time. The court, after stating that it thought mutual obligations were in the lease, said at page 672: ''But even assuming that the point is an arguable one and that the contract was unilateral in its inception . . . it is clear that the agreement became mutual, valid, and binding upon partial performance by defendant. . . .''

Herbert argues further that where an agreement in the nature of an option contemplates a series of separate transactions, the fact that the promisee has accepted the terms of the agreement, as applied to one or more transactions, will not constitute a consideration as to additional transactions, and that mere part performance of a contract which is not binding on the parties does not make it binding, so far as it remains executory. He refers to agreements contemplating a series of transactions involving the purchase of goods which agreements are invalid for want of consideration, and he correctly asserts that those agreements are not converted into binding contracts by orders for some of the goods. It is true that accepted orders for goods under such contracts constitute sales of the goods ordered at the prices stated in the contracts, but such orders do not validate the agreement as to other goods which the one refuses to purchase or the other refuses to sell. The cases cited by him in support of that argument are to the effect that part performance of contracts for the purchase of goods does not cure lack of consideration insofar as the contract remains executory. In a case of that character part performance does not affect the executory part of the contract because there is no criterion by which to establish the quantity of goods which, in the future, must be bought or sold. Therefore, in that kind of case it appears that it is not a question of lack of consideration, but is a lack of certainty. In one of the cited cases, *Cold Blast Transp. Co.* v. *Kansas City Bolt & Nut Co.*, 114 F. 77 [52 C.C.A. 25, 57 L.R.A. 696] (C.C.A.), the court said at page 79: ''Such promises are void, because they lack one of the essential elements of an agreement,—cer-

tainty in the things to be done.'' It was said further therein at page 80: ''The defendant never agreed to order or to pay for any quantity of these undelivered articles. If it had refused to order and take them, no action could have been maintained for its failure, because no court could have determined what amount it was required to take.'' The principle of law stated in those cases is settled, but it is not applicable herein since the subject matter of this contract is of a character quite different from that in the cited cases. ■ Services rendered by Wilck in successfully promoting and establishing Herbert as a play author, while selling one of his plays several times and attempting to sell others, would be of substantial benefit to him in the sale of other plays to be written and offered for sale by him. It appears that there was sufficient consideration for the contract herein by reason of the express and implied provisions therein and the part performance by Wilck in rendering substantial services at substantial expense to herself.

### Wilck's Appeal

The court instructed the jury that if it found that Wilck was entitled to damages that the measure of her recovery was 10 per cent of the gross proceeds already received by Herbert, and 10 per cent of the gross proceeds reasonably certain to be received by him in the future from the first class production of the play ''Kiss and Tell'' in the United States, Canada and Great Britain; that his gross proceeds to March 17, 1945, from such production amounted to $303,120.14, and that if she was entitled to recover she would be entitled to 10 per cent thereof, or $30,312. The jury was also instructed that in estimating the amount of the future gross proceeds of such first class production, if Wilck was entitled to recover, that it might take into consideration the amounts theretofore received by Herbert from such production, and also consider the opinions of persons experienced in theatrical matters respecting future amounts that might be realized from such source. There was testimony by Wilck that in her opinion the reasonable value of Herbert's right to the future proceeds from the first class production of the play in the United States was about $50,000 or $60,000. Apparently the jury found that she was entitled to 10 per cent of $60,000, or $6,000, as her commission on the future proceeds in the United States, since the verdict was for $36,312. There was no evidence as to the reasonable value

of such future proceeds in Great Britain, the court having sustained an objection to the qualifications of plaintiff's witness to give such an opinion.

At the request of Herbert, the court instructed the jury as follows: "You are instructed, if you find upon the evidence and under the instructions of the Court that Plaintiff is entitled to recover damages from the Defendant, and you further find that the Defendant, F. Hugh Herbert, has entered into any contracts for the motion picture production of the play, 'Kiss and Tell,' you must eliminate any income which you believe the said Defendant, F. Hugh Herbert has received or may receive from any such contracts in computing the damages to be awarded to the plaintiff." The court's ruling that income from the motion picture production should be eliminated in computing damages was upon the ground that the motion picture rights had been transferred by Herbert personally, and not through an agent, and that since the contract provided that he appointed her as his exclusive representative, as distinguished from giving her the exclusive right to sell his plays, he was not precluded from transferring the rights personally.

Wilck contends on her appeal, which relates only to the question of inadequacy of damages, that the agency contract precluded Herbert from directly disposing of the motion picture rights, and prevented him from selling his plays except through Wilck. In support of these contentions she refers particularly to the written provision that she shall be entitled to 10 per cent commission "under or by virtue of any contract effected, for which negotiations may have been carried on, within the term of this agreement." She argues that said provision means that she should be paid commissions on all contracts negotiated during the period of the existence of the employment agreement, including those negotiated by Herbert personally. That provision is to be considered in connection with other provisions of that contract. The next paragraph of the contract, succeeding the one wherein that provision appears, states that she is given authority to collect all money to accrue to him "by virtue of any contract that may be negotiated *under* this agreement." (Italics added.) This last mentioned paragraph limits her authority to collect money to contracts negotiated *under* the agreement. It would seem that there would be no reason to give her the right to receive

commissions on all contracts negotiated during the term of the agreement, irrespective of who negotiated them, and at the same time to restrict her right to collect to the money accruing from contracts negotiated by her under the agreement. Furthermore, the meaning of the provision that she should have commissions on *any contract* negotiated "within the term of this agreement," is to be interpreted in the light of the preceding paragraph in the agreement which refers to plays that she handles and to those that she rejects. Under her argument she would be entitled to commissions from plays which she rejected, if they were sold during the term of the agreement. It is inconceivable that it was intended that she would be entitled to commissions from plays which she did not handle, but which she rejected. The language of the provision relative to any contract negotiated within the term of the agreement must be limited by the context of the whole contract to contracts negotiated by her under her designation in the agency contract "as sole and exclusive representative." ▬▬ She prepared the contract, and if it had been intended that she should be paid commission on contracts which Herbert negotiated personally, she undoubtedly would have expressed such intention in clear language. Since she prepared the contract, any ambiguity therein must be resolved against her.

In further support of Wilck's contention that Herbert did not have the right to sell his plays, she refers to an "Agency Clause" which appeared in each of the four production contracts negotiated by her for "Quiet Please." That clause was to the effect that "in connection with the sale or lease of the subsidiary rights in said play," Herbert appointed Wilck as his agent, and agreed that she should be entitled to commissions of 10 per cent upon the proceeds of such sale or lease of the subsidiary rights. She argues that the provision in said "Agency Clause" in the production contracts for "Quiet Please," that she should have commissions on the "subsidiary rights," constitutes a contemporaneous exposition by Herbert that she was to have the sole right to handle the subsidiary rights, that is, the motion picture rights. It is to be noted that under that provision or clause in the production contracts concerning her commission on the subsidiary rights to "Quiet Please," she is designated his *agent* in connection with the subsidiary rights, and is not thereby given the exclusive *right* to sell or lease them.

In further support of her said contention that he did not have the right to sell his plays, she refers also to a provision in the agency contract as follows: "In the event that you reject said play, we shall be at liberty to submit it elsewhere without any further claim on your part." She argues that said provision means that as to plays which she did not reject Herbert would have no right to submit them elsewhere, and that he did not have the right to dispose of his plays during the term of the agency contract without first submitting them to Wilck. Apparently that provision was for the purpose of permitting Herbert to place rejected plays with other agents. It was necessary to specify that he was released from any obligation to her in regard to plays which she had rejected, since the agency contract designated her as his exclusive representative. The provision, relative to rejecting a play, does not limit the right of Herbert to contract personally for the sale of his plays.

Under the contract she was appointed "sole and exclusive representative." She did not have authority to contract for the sale or other disposition of a play, but had authority only to negotiate and to submit offers in regard thereto, since the agreement provided that she should submit any offer to him but that no agreement should be binding upon him without his signature. No price, terms, or conditions for the sale or disposal of a play were specified in the agency agreement, and it cannot be assumed, in view of the express language thereof, that she was invested with any discretion as to price, terms, or conditions of contracting. ▪ Ordinarily the mere appointment of an exclusive agent to sell certain property does not prevent the owner from making the sale himself without being liable for the agent's commission. (3 C.J.S. 71; 2 C.J. 777.) In Restatement, Agency, page 1058, section 449, comment b, it is said: "A contract to give an 'exclusive agency' to deal with specified property is ordinarily interpreted as not precluding competition by the principal personally but only as precluding him from appointing another agent to accomplish the result. On the other hand, the grant of an 'exclusive agency' to sell the products of a manufacturer or dealer in a specified territory is ordinarily interpreted as precluding competition by the principal in any form within the designated section. A contract to give the 'exclusive sale' of specified property

ordinarily indicates that the agent is to have the exclusive power. The use of the words 'exclusive agency' or 'exclusive sale' is not conclusive but, as in other cases involving interpretation, all the circumstances must be considered.'' In *Snook* v. *Page*, 29 Cal.App. 246, the court said at page 247 [155 P. 107]: ''The first question . . . is whether the plaintiffs were constituted the *exclusive agents* or were they given the exclusive *right* to sell said property. If the former only, the rule is well settled that 'the owner has the right to sell the same by his own unaided efforts without becoming liable to the broker for commission; that the only effect of such contract is to prevent the owner from placing the property in the hands of another agent and that the owner does not thereby relinquish his right to sell the property himself independently of the broker.' [Citing cases.]'' In *Faith* v. *Meisetschlager*, 45 Cal.App.7, the court said at page 9 [187 P. 61]: ''A contract authorizing real estate brokers to sell property, which merely makes them exclusive agents thereof, does not entitle such brokers to their commission on a sale made by the owner unaided by them. Under such circumstances the owner has the right to sell by his own individual efforts without becoming liable to the agents for a commission.'' Herbert had the right to sell the play and the subsidiary rights, personally and directly and independently of Wilck, without liability to her for commission.

Wilck contends also that, even if Herbert had the right to sell the play and the subsidiary rights himself, the jury should have been permitted to determine the fact whether he sold the motion picture rights directly or through an agent. If Herbert sold the motion picture rights through an agent he would be liable to Wilck for damages, if any, sustained by her. A question of fact was presented as to whether he sold the motion picture rights directly, or whether he sold them through the Sam Jaffe Agency. As above stated, about two months after Herbert wrote to Wilck discharging her, he employed the Sam Jaffe Agency as his exclusive agent to negotiate the sale of his literary material. Herbert concedes that the sale of the first-class production rights to Abbott was made by his agent, the Sam Jaffe Agency, acting through its representative Mary Baker. Mary Baker testified that as Herbert's agent she had preliminary discussions with various major picture companies with reference to the production

of a motion picture using the play, "Kiss and Tell"; that as part of her negotiations as his agent she "ultimately came in contact with Columbia Pictures Corporation"; that she sat in on the negotiations that led up to the contract of August 11, 1944, between Columbia Pictures Corporation and the Abbott-Herbert Corporation; that Mr. Martin Gang, the attorney for Herbert and for the Jaffe Agency, negotiated the contract. Mr. Siegel, a director of the Abbott-Herbert Corporation, testified that he had been a producer at Columbia Pictures Corporation; that while he was such producer negotiations were started with Columbia Pictures Corporation for its equipment and financial assistance in connection with the production of the motion picture; that the negotiations were commenced by Herbert with the aid of Mr. Gang and Mary Baker; that he (the witness) did not attend all the conferences that were held with the executives of Columbia Pictures Corporation, but in one or two of those conferences, which he attended, Mary Baker was there. Several letters and writings, comprising Exhibit 48 for identification, were offered in evidence by Wilck, but Herbert's objection thereto upon the ground that they were irrelevant was sustained. It was stipulated that the letters were forwarded, on or about the dates that they bear, by the persons purporting to sign them and to the addressees named in the letters.

One of those letters, dated May 21, 1943, from Jaffe to Abbott, outlined a plan for the organization of a corporation to produce a motion picture from the play, "Kiss and Tell," and indicated a proposed corporate set-up aimed at sustaining a capital gain rather than current income. Another letter, dated September 21, 1943, from Mr. Gang to Columbia Pictures Corporation, stated that he and Mary Baker had carefully considered a memorandum from Columbia Pictures Corporation regarding production of the picture, and he requested that the corporation prepare a contract so that it might be sent to New York for examination by Abbott and Herbert and their attorneys. Another letter, dated October 13, 1943, from Abbott to Herbert (a copy being sent to Mary Baker), criticized the proposed corporate set-up from a tax standpoint, and stated further: "We are obligated to the Jaffe Agency for 10% of the picture sale less the Arbiter's fees. I think that they can be of great value to us, and I think we should retain them giving them 10% of everything we make on the picture." Another letter, dated January 14, 1944,

from Mary Baker to Mr. Gang, outlined the basic terms of the proposed deal with Columbia Pictures Corporation. It stated in part: "You asked me to outline the basic terms of the Columbia deal." The transaction as consummated, for the production of the picture, was similar to the proposals and efforts made by the Jaffe Agency. It proposed that an organization be formed to handle the picture in order to realize capital gains. The result was that a corporation was formed and the picture rights were sold to it in an effort to realize capital gains. It proposed that the new corporation produce the pictures, and that was the result. It commenced discussions with Columbia Pictures Corporation to obtain financing and to secure that company as distributing agent. That company furnished a large part of the financing and became the distributor. It proposed that consideration be given to obtaining Shirley Temple for a part in the picture and to obtaining Mr. Siegel as producer. The result was that she had a leading part in the picture, and he was the producer. It appears that the letters, above referred to, were relevant to the issue whether Herbert sold the picture rights independently of an agent or through an agent. (By reason of that conclusion, it is not necessary to determine herein whether other letters or writings in Exhibit 48 for identification were admissible in evidence.) The creation of the corporation, the execution of the contract with Columbia Pictures Corporation, and the issuance of stock to Herbert for the transfer of his motion picture rights might have been viewed as one transaction. The question as to whether Herbert sold the motion picture rights directly and independently of his agent, the Jaffe Agency, or whether those rights were sold through the negotiations of his agent or with the aid of his agent, should have been submitted to the jury. By reason of the failure to submit that issue of fact to the jury, it is necessary to reverse the judgment for a reassessment of damages.

Another contention of Wilck is that the court erred in sustaining an objection to the proffered testimony of her witness Jackson as to whether, in his opinion, the play "Kiss and Tell" would be a success in Great Britain, and as to the fair market value of the author's rights in the British production of that play. The witness testified that he was a playwright and author; that he was at the time he testified a writer for United Artists; that his first play was produced in 1915; that he had written several plays which were produced success-

fully in the United States and England; that he went to England in 1925 and wrote several plays there; that he came back to the United States in 1935, and had not been in England since that time; that he had read the play, "Kiss and Tell." He was asked by Wilck's counsel: "In your opinion, will that play be a success in Great Britain?" Counsel for Herbert objected thereto on the ground that it was incompetent and that no foundation had been laid. The objection was sustained, the court stating in part: "I will uphold the objection to his qualifications to pass on the value of a play produced in England at this time, in view of the fact that it is not shown that he has been there for the last ten years, and therefore is not in a position, in the Court's opinion, to properly evaluate the play in England at this time." Counsel for Wilck then offered to prove that the witness would state that he had an opinion as to the present fair market value of the author's rights to the British production of the play, and that he would state that in his opinion such rights, in that respect, were of the value of $50,000. An objection to the offer of proof was sustained. Wilck argues that the ruling of the court was a declaration that as a matter of law the absence of the witness from England for ten years disqualified him as a witness to give such opinion, and argues further that such absence would relate only to the weight to be given to his testimony. The play had not been produced in London, but had been "tried out of town there," and there was a delay in producing it in London by reason of robot bombing in England. From 1935, when the witness left England, to the time of the trial England had experienced major economic and social changes. World War II had caused great damage in England. At the time of the trial robot bombing in England continued, and the outcome of the war was uncertain. The ruling of the court as to the opinions of the witness was correct.

The judgment is reversed as to that portion thereof which fixes the amount of damages payable to plaintiff, and the cause is remanded for a retrial for the sole purpose of determining, in accordance with the views herein expressed, the amount of damages which should be awarded to plaintiff. The order denying Herbert's motion for judgment notwithstanding the verdict is affirmed. Plaintiff to recover costs.

Desmond, P. J., and Kincaid, J. pro tem., concurred.

A petition for a rehearing was denied March 26, 1947.